INTERSTATE COMMERCE COMMISSION *v.* BROTH-
ERHOOD OF LOCOMOTIVE ENGINEERS ET AL.

No. 85–792.   Argued November 10, 1986–Decided June 8, 1987*

---

*Together with No. 85–793, *Missouri-Kansas-Texas Railroad Co.* v.
*Brotherhood of Locomotive Engineers et al.*, also on certiorari to the same
court.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which BRENNAN, MAR-SHALL, and BLACKMUN, JJ., joined, *post*, p. 287.

*Henri F. Rush* argued the cause for petitioner in No. 85-792. With him on the briefs were *Solicitor General Fried, Deputy Solicitor General Cohen, Robert S. Burk,* and

*Sidney L. Strickland, Jr.  Joseph L. Manson III*, argued the cause for petitioner in No. 85–793.  With him on the briefs was *Michael E. Roper.*

*Harold A. Ross* argued the cause and filed a brief for respondent Brotherhood of Locomotive Engineers in both cases.  *John O'B. Clarke, Jr.*, argued the cause for respondent United Transportation Union in both cases.  With him on the brief was *Robert L. Hart.  Charles A. Miller, Gregg H. Levy*, and *Mark B. Goodwin* filed a brief for respondents Union Pacific Railroad Co. et al.†

JUSTICE SCALIA delivered the opinion of the Court.

On September 15, 1980, Union Pacific Railroad Co. (UP) and Missouri Pacific Railroad Co. (MP) and their respective corporate parents filed a joint application with the Interstate Commerce Commission (ICC or Commission) seeking permission for UP to acquire control of MP.  The same day, a similar but separate application was jointly filed by UP and the Western Pacific Railroad Co. (WP).  In a consolidated proceeding, the control applications were opposed by a number of labor organizations, including respondents Brotherhood of Locomotive Engineers (BLE) and United Transportation Union (UTU), as well as several competing railroads, including petitioner Missouri-Kansas-Texas Railroad Co. (MKT) and the Denver and Rio Grande Western Railroad Co. (DRGW).  MKT and DRGW, in addition to opposing the mergers, filed responsive applications seeking the right to conduct operations using the track of the new consolidated carrier in the event that the control applications were approved.  MKT's request for trackage rights specified that "MKT, with its own employees, and at its sole cost and expense, shall operate its engines, cars and trains on and along Joint Track."  Proposed Trackage Rights Agreement § 5, Fi-

---

†*Richard T. Conway, William F. Sheehan*, and *Kenneth P. Kolson* filed a brief for the Association of American Railroads et al. as *amici curiae* urging reversal.

nance Docket No. 30,000 (Sub.–No. 25). DRGW's application indicated that it "may, at its option, elect to employ its own crews for the movement of its trains, locomotives and cars to points on or over the Joint Track." Proposed Trackage Rights Agreement § 6(c)(3), Finance Docket No. 30,000 (Sub.–No. 18).

On October 20, 1982, the ICC approved UP's control acquisitions and granted MKT's application for trackage rights over 200 miles of MP and UP track in four States and DRGW's application for rights over 619 miles of MP track between Pueblo and Kansas City. See *Union Pacific Corp., Pacific Rail System, Inc. & Union Pacific R. Co.—Control—Missouri Pacific Corp. & Missouri Pacific R. Co.*, 366 I. C. C. 459 (1982), aff'd *sub nom. Southern Pacific Transportation Co.* v. *ICC*, 237 U. S. App. D. C. 99, 736 F. 2d 708 (1984), cert. denied, 469 U. S. 1208 (1985). The approved trackage rights were to become effective "immediately upon consummation of the consolidations." 366 I. C. C., at 590.

It is the Commission's standard practice, in pursuit of its statutory responsibility to shield railroad employees from dislocations resulting from actions that it approves, see 49 U. S. C. § 11347, to impose on trackage rights transactions a set of employee protections known as the *"NW-BN-Mendocino"* conditions. See *Norfolk and Western R. Co.—Trackage Rights—Burlington Northern, Inc.*, 354 I. C. C. 605 (1978), modified, *Mendocino Coast R. Co.—Lease and Operate—California Western R. Co.*, 360 I. C. C. 653 (1980), aff'd *sub nom. Railway Labor Executives' Assn.* v. *United States*, 219 U. S. App. D. C. 23, 675 F. 2d 1248 (1982). These provide, *inter alia*, for "the selection of forces from all employees involved," 354 I. C. C., at 610, in transactions involving the dismissal or displacement of employees, and for retention of "[t]he rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits . . . unless changed by future collective bargaining agreements or applicable statutes." *Ibid.* The ICC's Octo-

ber 20, 1982, order indicated, without discussion, that approval of the trackage rights applications was "subject to the imposition of employee protective conditions to the extent specified in *[NW-BN* and *Mendocino]*." 366 I. C. C., at 654. See also *id.*, at 471, 622.

The control transactions among UP, MP, and WP were consummated on December 22, 1982, at which point the grants of trackage rights also became effective. MKT commenced its operations, using its own crews, on or about January 6, 1983; and DRGW shortly thereafter entered into an agreement with MP providing "for using MP crews on [DRGW] trains for a temporary, interim period, after which [DRGW] will operate the trains with [its] own crews." App. in Nos. 83–2290 and 83–2317 (CADC), p. 6. Although numerous parties, including BLE, had petitioned for review of the Commission's October 20, 1982, order (which was affirmed in most respects some 18 months later, see *Southern Pacific Transportation Co.* v. *ICC, supra*), no question concerning the crewing of MKT or DRGW trains was raised at that time. However, on April 4, 1983, BLE filed with the Commission a "Petition for Clarification," contending that the Commission had no jurisdiction to, and as a matter of consistent practice did not, inject itself into labor matters such as crew selection, and asking the Commission to declare that its October 20, 1982, order did not have the intent or effect of authorizing the tenant carriers to use their own crews on routes that they had not previously served.[1] In a brief order served May 18, 1983, the Commission denied the petition, ruling that its prior decision "does not require clarification." App. to Pet. for Cert. in No. 85–793, p. A38. The

---

[1] Ordinarily, a petition for relief from a final order is denominated a "petition to reopen." See 49 CFR §§ 1115.3(a), 1115.4 (1986). A Commission rule, however, permits parties to "see[k] relief not provided for in any other rule," 49 CFR § 1117.1 (1986), including clarification of the terms of a prior order. See *Burlington Northern Inc.* v. *United States*, 459 U. S. 131, 136 (1982).

tenant railroads, it said, had proposed to use their own crews in their trackage rights applications, and "our approval of the applications authorizes such operations." *Ibid.*

Within the period prescribed by Commission rules for filing petitions for administrative review, see 49 CFR § 1115.3(e) (1986), both BLE and UTU sought "reconsideration" of the Commission's denial. In addition to repeating BLE's earlier arguments, the unions contended that the tenant railroads' crewing procedures constituted a unilateral change in working conditions forbidden by the *NW-BN-Mendocino* labor protective conditions, by the Railway Labor Act, 45 U. S. C. § 151 *et seq.* (RLA), and by collective-bargaining agreements, and that the Commission had made no findings that would justify exempting the trackage rights transactions from applicable labor laws. In a lengthy order served on October 25, 1983, responding in some detail to all of the major contentions, the Commission denied the petitions. In particular, the Commission emphasized its reliance on 49 U. S. C. § 11341(a), which provides that a carrier participating in a consolidation approved by the Commission "is exempt from the antitrust laws and from all other law . . . as necessary to let that person carry out the transaction . . . ." The Commission concluded that the exemption provided by this section extends to the RLA and is self-executing, requiring no findings by the Commission to make it effective.

On December 16, 1983, BLE petitioned for judicial review of the May 18, 1983, and October 25, 1983, orders; UTU petitioned for review of the latter order on December 23, 1983. The cases were consolidated, and the United States Court of Appeals for the District of Columbia Circuit vacated both orders. 245 U. S. App. D. C. 311, 761 F. 2d 714 (1985). The court rejected the threshold claim that the appeals were time barred, and concluded on the merits that if the ICC intended to exempt the railroads from the requirements of the RLA, it was required to explain, as it had not done, why that exemp-

tion was necessary to effectuate the transactions it approved. The dissent disagreed on both counts.

MKT and the Commission filed petitions for certiorari on the question of the proper construction of § 11341(a), which we granted and consolidated for argument. See 475 U. S. 1081 (1986). We now conclude that the petitions for review must be dismissed.

## I

The petitions for review and the Court of Appeals' order encompass both the May 18, 1983, order refusing to clarify the Commission's prior approval order, and the October 25, 1983, order refusing to reconsider that refusal to clarify. We consider first the appeal of the latter order.

With certain exceptions not relevant here, see 28 U. S. C. § 1336(b), judicial review of final orders of the ICC is governed by the Hobbs Act, 28 U. S. C. § 2341 *et seq.*, which provides that any party aggrieved by a "final order" of the Commission "may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." § 2344. A Commission order in a rail proceeding is "final on the date on which it is served." 49 U. S. C. § 10327(i). The Commission's order refusing to reconsider its refusal to clarify thus became final on October 25, 1983, and the unions' petitions for review—filed on December 16, 1983, and December 23, 1983—were therefore timely for purposes of reviewing that order (though they obviously were not timely for purposes of reviewing the original order of October 20, 1982). However, although the timeliness requirements of the Hobbs Act were satisfied, the order from which the unions have appealed is unreviewable.

The Commission's authority to reopen and reconsider its prior actions stems from 49 U. S. C. § 10327(g), which provides:

> "The Commission may, at any time on its own initiative because of material error, new evidence, or substantially changed circumstances—

"(A) reopen a proceeding;

"(B) grant rehearing, reargument, or reconsideration of an action of the Commission; and

"(C) change an action of the Commission.

"An interested party may petition to reopen and reconsider an action of the Commission under this paragraph under regulations of the Commission."

When the Commission reopens a proceeding for any reason and, after reconsideration, issues a new and final order setting forth the rights and obligations of the parties, that order—even if it merely reaffirms the rights and obligations set forth in the original order—is reviewable on its merits. See, *e. g.*, *United States* v. *Seatrain Lines, Inc.*, 329 U. S. 424 (1947). Where, however, the Commission *refuses* to reopen a proceeding, what is reviewable is merely the lawfulness of the refusal. Absent some provision of law requiring a reopening (which is not asserted to exist here), the basis for challenge must be that the refusal to reopen was "arbitrary, capricious, [or] an abuse of discretion." 5 U. S. C. § 706 (2)(A). We have said that overturning the refusal to reopen requires "a showing of the clearest abuse of discretion," *United States* v. *Pierce Auto Freight Lines, Inc.*, 327 U. S. 515, 534–535 (1946), and we have actually reversed the ICC only once, see *Atchison, T. & S. F. R. Co.* v. *United States*, 284 U. S. 248 (1932), in a decision that was "promptly restricted . . . to its special facts, . . . and . . . stands virtually alone." *ICC* v. *Jersey City*, 322 U. S. 503, 515 (1944). See also *Bowman Transportation, Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 295–296 (1974). More importantly for present purposes, all of our cases entertaining review of a refusal to reopen appear to have involved petitions alleging "new evidence" or "changed circumstances" that rendered the agency's original order inappropriate. See *id.*, at 295, and cases cited therein; *Jersey City, supra*, at 514–518, and cases cited therein. We know of no case in which we have reviewed the denial of a petition to reopen

based upon no more than "material error" in the original agency decision. There is good reason for distinguishing between the two. If review of denial to reopen for new evidence or changed circumstances is unavailable, the petitioner will have been deprived of all opportunity for judicial consideration—even on a "clearest abuse of discretion" basis—of facts which, through no fault of his own, the original proceeding did not contain. By contrast, where no new data but only "material error" has been put forward as the basis for reopening, an appeal places before the courts precisely the same substance that could have been brought there by appeal from the original order—but asks them to review it on the strange, one-step-removed basis of whether the agency decision is not only unlawful, but *so* unlawful that the refusal to reconsider it is an abuse of discretion. Such an appeal serves no purpose whatever where a petition for reconsideration has been filed within a discretionary review period specifically provided by the agency[2] (and within the period allotted for judicial review of the original order), since in that situation the petition tolls the period for judicial review of the original order, which can therefore be appealed to the courts *directly* after the petition for reconsideration is denied. And where the petition is filed *outside* that period (and outside the

---

[2] The ICC's regulations, for example, provide as follows:

"(a) A discretionary appeal is permitted. It will be designated a 'petition for administrative review,' except that, when it is related to an action of the entire Commission in the first instance, it must be designated a 'petition to reopen.'

"(b) The petition will be granted only upon a showing of one or more of the following points:

.          .          .          .          .

"(3) The prior action was taken by the entire Commission in the first instance, and involves material error.

.          .          .          .          .

"(e) Petitions must be filed within 20 days after the service of the action or within any further period (not to exceed 20 days) as a division or the Commission may authorize." 49 CFR § 1115.3 (1986).

period for judicial review of the original order) judicial review would serve only the peculiar purpose of extending indefinitely the time within which *seriously* mistaken agency orders can be judicially overturned. That is to say, the Hobbs Act's 60-day limitation provision would effectively be subjected to a proviso that reads: "Provided, however, that if the agency error is so egregious that refusal to correct it would be an abuse of discretion, judicial review may be sought at any time."

For these reasons, we agree with the conclusion reached in an earlier case by the Court of Appeals that, where a party petitions an agency for reconsideration on the ground of "material error," *i. e.*, on the same record that was before the agency when it rendered its original decision, "an order which merely denies rehearing of . . . [the prior] order is not itself reviewable." *Microwave Communications, Inc.* v. *FCC*, 169 U. S. App. D. C. 154, 156, n. 7, 515 F. 2d 385, 387, n. 7 (1974). See also *SEC* v. *Louisiana Public Service Comm'n*, 353 U. S. 368, 371–372 (1957); *National Bank of Davis* v. *Comptroller of Currency*, 233 U. S. App. D. C. 284, 285, and n. 3, 725 F. 2d 1390, 1391, and n. 3 (1984); 5 U. S. C. § 701(a)(2). This rule is familiar from other contexts. If a judicial panel or an en banc court denies rehearing, no one supposes that that denial, as opposed to the panel opinion, is an appealable action (though the filing of a timely rehearing petition, like the filing of a timely petition for agency reconsideration, extends the time for appealing from the original decision).

It is irrelevant that the Commission's order refusing reconsideration discussed the merits of the unions' claims at length. Where the Commission's formal disposition is to deny reconsideration, and where it makes no alteration in the underlying order, we will not undertake an inquiry into whether reconsideration "in fact" occurred. In a sense, of course, it always occurs, since one cannot intelligently rule upon a petition to reconsider without reflecting upon, among

other things, whether clear error was shown. It would hardly be sensible to say that the Commission can genuinely deny reconsideration only when it gives the matter no thought; nor to say that the character of its action (as grant or denial) depends upon whether it chooses to disclose its reasoning. Rather, it is the Commission's formal action, rather than its discussion, that is dispositive. Accordingly, the petitions for review of the Commission's October 25, 1983, order refusing to reconsider its May 18, 1983, refusal to clarify should have been dismissed.

That portion of the concurrence which deals with the issue of jurisdiction (Part I) consists largely of the citation and discussion of numerous cases affording judicial review of agency refusals to reopen. In the third from last paragraph, however, one finds the acknowledgment that all these cases involved refusals "based upon new evidence or changed circumstances" rather than upon "material error," *post*, at 293–294, and are therefore fully in accord with the principle set forth in the present opinion. The only point of dispute between this opinion and the concurrence is whether separate treatment of refusals to reopen based on material error has some basis in statute or is rather, as the concurrence would have it, "a pure creature of judicial invention." *Post*, at 294.

Even if our search for statutory authorization were limited to the text of the Hobbs Act, it seems to us not inventiveness but the most plebeian statutory construction to find implicit in the 60-day limit upon judicial review a prohibition against the agency's permitting, or a litigant's achieving, perpetual availability of review by the mere device of filing a suggestion that the agency has made a mistake and should consider the matter again. Substantial disregard of the Hobbs Act is effected, not by our opinion, but by what the concurrence delivers (after having rejected our views) in Part II of its opinion: on-the-merits review of an agency decision of law rendered 14 months before the petition for review was filed, *using the same standard of review that would have been*

*applied had appeal been filed within the congressionally
prescribed 60-day period.*

Statutory authority for preventing this untoward result
need not be sought solely in the Hobbs Act, however. While
the Hobbs Act specifies the form of proceeding for judicial re-
view of ICC orders, see 5 U. S. C. § 703, it is the Adminis-
trative Procedure Act (APA) that codifies the nature and
attributes of judicial review, including the traditional princi-
ple of its unavailability "to the extent that . . . agency action
is committed to agency discretion by law." 5 U. S. C. § 701
(a)(2). We have recently had occasion to apply this limita-
tion to the general grant of jurisdiction contained in 28
U. S. C. § 1331, see *Heckler* v. *Chaney,* 470 U. S. 821 (1985);
it applies to the general grant of jurisdiction of the Hobbs Act
as well. In *Chaney* we found that the type of agency deci-
sion in question "has traditionally been 'committed to agency
discretion,' and . . . that the Congress enacting the APA did
not intend to alter that tradition." *Id.,* at 832. As dis-
cussed above, we perceive that a similar tradition of non-
reviewability exists with regard to refusals to reconsider for
material error, by agencies as by lower courts; and we be-
lieve that to be another tradition that 5 U. S. C. § 701(a)(2)
was meant to preserve. We are confirmed in that view by
the impossibility of devising an adequate standard of review
for such agency action. One is driven either to apply the or-
dinary standards for reviewing errors of fact or law (in which
event the time limitation of the Hobbs Act—or whatever
other time limitation applies to the particular case—will be
entirely frustrated); or else to adopt some "clearly erroneous"
standard (which produces the strange result that only *really
bad* mistakes escape the time limitation—whatever "really
bad" might mean in this context where great deference is al-
ready accorded to agency action). The concurrence chooses
to impale itself upon the first horn of this dilemma.

The concurrence's effort to bring *SEC* v. *Chenery Corp.,*
332 U. S. 194 (1947), into the present discussion is mis-

guided. That case pertains to the basis that a court may use for the affirmance *of agency action that is reviewable.* (It may not affirm on a basis containing any element of discretion—including discretion to find facts and interpret statutory ambiguities—that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court.) *Chenery* has nothing whatever to do with *whether agency action is reviewable.* It does not establish, as the concurrence evidently believes, the principle that if the agency gives a "reviewable" reason for otherwise unreviewable action, the action becomes reviewable. To demonstrate the falsity of that proposition it is enough to observe that a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction. That is surely an eminently "reviewable" proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review.

Finally, we may note that the concurrence's solution to review of denials of reconsideration, in addition to nullifying limitation periods, is simply not workable (or not workable on any basis the concurrence has explained) in the vast majority of cases. The concurrence reviews the Commission's stated conclusions regarding 49 U. S. C. § 11341 on the usual basis applicable to agency conclusions of law, and reviews the Commission's stated refusal to consider the newly raised (though previously available) issue of RLA crewing rights on an "abuse of discretion" standard. The vast majority of denials of reconsideration, however, are made *without statement of reasons,* since 5 U. S. C. § 555(e) exempts from the normal APA requirement of "a brief statement of the grounds for denial" agency action that consists of "affirming a prior denial." One wonders how, in this more normal context, the concurrence would go about determining what answer *Chenery* supplies to the question of reviewability—and,

if the answer permits review, what standard to apply. Under the proper analysis, the solution is clear: If the petition that was denied sought reopening on the basis of new evidence or changed circumstances review is available and abuse of discretion is the standard; otherwise, the agency's refusal to go back over ploughed ground is nonreviewable.

## II

There remains BLE's appeal from the May 18, 1983, order denying its petition for clarification. While the petition for review was filed more than 60 days after that order was served, we conclude that it was nonetheless effective, because the timely petition for administrative reconsideration stayed the running of the Hobbs Act's limitation period until the petition had been acted upon by the Commission. A contrary conclusion is admittedly suggested by the language of the Hobbs Act and of 49 U. S. C. § 10327(i), which provides that, "[n]otwithstanding" the provision authorizing the Commission to reopen and reconsider its orders (§ 10327(g)), "an action of the Commission . . . is final on the date on which it is served, and a civil action to enforce, enjoin, suspend, or set aside the action may be filed after that date." This would seem to mean that the pendency of reconsideration motions does not render Commission orders nonfinal for purposes of triggering the Hobbs Act limitations period. The same argument could be made, however, with respect to a similar provision of the APA, 5 U. S. C. § 704, which reads in relevant part: "Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section [entitled 'Actions Reviewable'] whether or not there has been presented or determined an application for . . . any form of reconsiderations, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority." That language has long been construed by this and other courts merely to relieve

parties from the *requirement* of petitioning for rehearing before seeking judicial review (unless, of course, specifically required to do so by statute—see, *e. g.*, 15 U. S. C. §§ 717r, 3416(a)), but not to prevent petitions for reconsideration that are actually filed from rendering the orders under reconsideration nonfinal. See *American Farm Lines* v. *Black Ball Freight Service*, 397 U. S. 532, 541 (1970) (dictum); *CAB* v. *Delta Air Lines, Inc.*, 367 U. S. 316, 326–327 (1961) (dictum); *id.*, at 339–343 (Whittaker, J., dissenting); *Outland* v. *CAB*, 109 U. S. App. D. C. 90, 93, 284 F. 2d 224, 227 (1960). We can find no basis for distinguishing the language of § 10327(i) from that of § 704. The appeal from the denial of clarification was therefore timely.

As with the Commission's denial of reconsideration, however, its denial of clarification was not an appealable order. If BLE's motion is treated as a genuine "Petition for Clarification"—*i. e.*, as seeking nothing more than specification, one way or the other, of what the original order meant with regard to crewing rights—then the denial is unappealable because BLE was not "aggrieved" by it within the meaning of the Hobbs Act. BLE could have been aggrieved by a refusal to clarify in this narrow sense only if the refusal left it uncertain as to the Commission's view of its rights or obligations, which plainly was not the case. Though the May 18, 1983, order denied the petition for clarification, the text of the denial made it unmistakably clear that the Commission interpreted the October 20, 1982, order as authorizing MKT and DRGW to use their own crews. BLE could, of course, disagree with that construction, but it could hardly complain that the clarification it sought had not been provided.

In fact, however, we think that BLE's petition was understood by all of the parties to be in effect a petition to reopen. BLE did not merely ask the Commission for clarification; it asked for clarification "in the manner set forth [in the petition]," App. in Nos. 83–2290 and 83–2317 (CADC), p. 5, *i. e.*, for "clarification" that the October 20, 1982, order meant

what the unions believed it to mean.  Most precisely described, the petition sought, *in the alternative*, clarification or (in the event clarification would be contrary to the union's interpretation) reopening of the earlier order.  Even when the petition is viewed as a petition to reopen, however, the Commission's denial is no more reviewable than is its denial of the petitions for reconsideration discussed earlier.  BLE brought forth no new evidence or changed circumstances; it merely urged the Commission to correct what BLE thought to be a serious error of law.  That should have been sought many months earlier, by an appeal from the original order.

We are not prepared to acknowledge an exception to that requirement where an order is ambiguous, so that a party *might* think that its interests are not infringed.  The remedy for such ambiguity is to petition the Commission for reconsideration within the 60-day period, enabling judicial review to be pursued (if Commission resolution of the ambiguity is adverse) after disposition of that petition.  Otherwise, the time limits of the Hobbs Act would be held hostage to ever-present ambiguities.  If, of course, the ICC's action here had gone beyond what was (at most) clarification of an ambiguity, and in the guise of interpreting the original order in fact *revised* it, that would have been a new order immediately appealable.  It is impossible to make such a contention here. It was, at the very most, *arguable* that the Commission's routine reference to the general *NW-BN-Mendocino* conditions was meant to cause those conditions to supersede, in the event of conflict, the specific terms of the trackage rights applications that the Commission generally approved—and also far from certain that any conflict between the two existed, since it was unclear whether the protective conditions extended to the situation in which the landlord and tenant railroads conduct no joint operations and the tenant carries only traffic for its own account.

The case is remanded to the Court of Appeals with instructions to dismiss the petitions for lack of jurisdiction.

*Vacated and remanded.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, concurring in the judgment.

Congress has authorized interested parties to petition the Interstate Commerce Commission (ICC or Commission) to reopen a proceeding, grant rehearing or reconsideration, or change an action of the Commission "because of material error, new evidence, or substantially changed circumstances." 49 U. S. C. § 10327(g). The statute draws no distinction between petitions alleging that the action was based on "material error" and petitions alleging "new evidence, or substantially changed circumstances." Nor does the Hobbs Act, 28 U. S. C. § 2341 *et seq.*, which affords judicial review of agency orders, recognize any such distinction. Yet, solely because it believes that such a distinction is desirable as a matter of policy, the Court today fashions a new rule of "jurisdiction."

The Court holds that agency decisions denying petitions for reopening based on "material error" are not subject to judicial review, even if the denial is arbitrary or contrary to law. Because this holding is not supported by the relevant statutes, and is contrary to longstanding principles of administrative law, I cannot subscribe to it. Addressing the merits, I conclude that the Court of Appeals erred in reversing the ICC's decisions not to reopen the matter before it. To the extent that the Commission based those decisions on its reading of the statute, its reading was correct; to the extent that it refused to consider issues not raised previously, it did not abuse its discretion.

I

The Administrative Orders Review Act, 28 U. S. C. § 2341 *et seq.*, commonly known as the Hobbs Act, is quite plain in

spelling out when and where parties may file petitions for judicial review of agency decisions. After stating that the courts of appeals have exclusive jurisdiction to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of all rules, regulations, or final orders of the Interstate Commerce Commission," 28 U. S. C. § 2342 (except for certain orders not relevant here which are reviewed in the district courts, see 28 U. S. C. § 2321), the Act provides:

> "Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals where venue lies." 28 U. S. C. § 2344.

The Court appears to agree that all of these elements were satisfied here. The denials of reopening and reconsideration constituted final orders; respondents were aggrieved parties; the petitions were filed within the required time period; and venue was appropriate in the United States Court of Appeals for the District of Columbia Circuit. Nonetheless, the Court concludes that the Court of Appeals should have dismissed the petitions for want of jurisdiction.

I agree with the Court that the only agency actions properly before the Court of Appeals were the ICC's denial of clarification served on May 18, 1983 (which the Court properly treats as a motion to reopen), and the ICC's denial of reconsideration served on October 25, 1983. I also agree that, depending on an agency's regulations, a decision whether to reopen may be based on discretionary factors that will virtually always survive judicial review. But this does not divest the courts of appeals of jurisdiction; it simply means that an agency's decision based on such discretionary considerations will almost always, if not always, be upheld as not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S. C. § 706(2)(A). See *United States v. Pierce Auto Freight Lines, Inc.*, 327 U. S. 515, 535 (1946).

Not every denial of a petition for reopening is premised on discretionary considerations. In many contexts the agency's

authority to exercise its discretion is limited by regulation, and the agency may choose to justify its denial of the petition on the ground that those criteria have not been satisfied. Here, for example, the regulations allowed the Commission to grant a petition for reopening of a decision reached by the entire Commission only if the petitioner could show either that "[t]he prior action . . . will be affected materially because of new evidence or changed circumstances," or that the prior action "involves material error." 49 CFR § 1115.3 (1986). Similarly, a statute provides that the Commission may only supplement a prior order approving consolidations and related transactions if "cause exists," 49 U. S. C. § 11351, a term that has been interpreted narrowly by some courts. See *Illinois* v. *ICC*, 713 F. 2d 305, 310 (CA7 1983); *Greyhound Corp.* v. *ICC*, 215 U. S. App. D. C. 322, 330, 668 F. 2d 1354, 1362 (1981). When an agency denies rehearing on a legal ground, such as when it premises its decision on its reading of the statute, the reviewing court has a significant role to play; it must decide whether that reading can be sustained, or whether it is contrary to law.[1] As we explained in *Pierce Auto Freight Lines*, the court's job is to ascertain

---

[1] In *Heckler* v. *Chaney*, 470 U. S. 821 (1985), the Court held that agency decisions not to take enforcement action are generally committed to agency discretion by law under 5 U. S. C. § 701(a)(2). Even so, the Court stressed that it was not dealing with "a refusal by the agency to institute proceedings based solely on the belief that it lacked jurisdiction." *Id.*, at 833, n. 4; see also *NAACP* v. *FPC*, 425 U. S. 662 (1976) (reviewing agency's refusal to promulgate rule because refusal was based on agency's contention that it lacked jurisdiction); *International Union, United Automobile, Aerospace, & Agricultural Implement Workers* v. *Brock*, 251 U. S. App. D. C. 239, 247, 783 F. 2d 237, 245 (1986) (distinguishing decisions announcing that agency will not take enforcement action from decisions announcing substantive statutory interpretations).

Of course, an agency may, if it chooses, deny the petition on discretionary grounds without considering whether the petition makes a showing sufficient to support reopening under the statute or regulations. See *INS* v. *Bagamasbad*, 429 U. S. 24, 26 (1976).

"whether there is warrant in the law and the facts for what the Commission has done." 327 U. S., at 536.

One of the basic tenets of judicial review of agency decisions is that "an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *FPC* v. *Texaco, Inc.*, 417 U. S. 380, 397 (1974), quoting *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168–169 (1962). As the Court explained in *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947):

> "[A] simple but fundamental rule of administrative law ... is ... that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action." *Id.*, at 196.[2]

Consequently, when an agency explains that it has denied a petition for reopening based on its understanding of the underlying statute, a reviewing court may only uphold the agency decision if that reasoning withstands review. To be sure, an agency may announce that it has declined to consider the petition for reopening because it is duplicative, because it was filed so late in the day, or for some other discretionary consideration. If the agency explains its decision on such grounds, its reasoning must be scrutinized under an abuse-of-discretion standard.[3] But if the agency chooses not to pro-

---

[2] Contrary to the Court's suggestion, *ante*, at 282–283, I do not believe that *Chenery* establishes whether agency action is reviewable. *Chenery* does, however, powerfully rebut the Court's contention that there is nothing to review when an agency bases a decision on an erroneous legal ground when it *could* have denied relief on discretionary grounds.

[3] The Court ignores this fact when it claims that litigants will routinely disregard the Hobbs Act's 60-day limit on judicial review unless denials of reopening are declared nonreviewable. Because an agency has the right to reject the petition on discretionary grounds, without reaching the mate-

ceed in that fashion and to base its decision on its reading of a statute or a constitutional provision, its decision cannot be sustained on the conjecture that it has the discretion to deny reopening on a variety of grounds. If the court of appeals finds legal error, it must remand the case to the agency, which may then consider whether to exercise its discretion to grant the petition for reopening.[4] This is the lesson of *Chenery* and its progeny—a lesson the Court ignores today when it claims that "it is the Commission's formal action, rather than its discussion, that is dispositive." *Ante*, at 281.

The Court argues that it would be more prudent to require the parties to seek review in the court of appeals immediately after an agency's initial decision. This may or may not be true.[5] But our view of efficient procedure does not give us the power to rewrite the United States Code or the Code of Federal Regulations. Nor does it justify ignoring this Court's decisions explicitly holding that a denial of a petition for reopening is reviewable, see *Giova* v. *Rosenberg*, 379 U. S. 18 (1964); reversing an agency for failing to reopen a

rial error alleged by the party, see n. 1, *supra*, litigants have the strongest of incentives to seek timely review of the agency's original decision.

[4] That many or even most denials of petitions for reopening are made without statements of reasons does not make judicial review unworkable. Of course, to the extent that 5 U. S. C. § 555(e) allows the agency to announce its denial without a statement, it may continue to do so. See *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519 (1978). In such a case, the reviewing court may properly presume that the decision was reached on ordinary discretionary considerations, and may review the decision on that basis to ascertain whether it constitutes an abuse of discretion.

[5] In some cases, an agency might base its order denying reopening on a new legal ground which it had not included in its original decision. Alternatively, the agency may clarify its earlier decision in a manner that gives rise to new legal challenges. In either event, it is surely unfair to deprive the aggrieved party of judicial review of an agency interpretation which he or she had no prior opportunity to challenge. The Court seems to agree that such an order would be reviewable, see *ante*, at 286, but, of course, cannot square this position with its newfound rule of "jurisdiction."

matter, see *Atchison, T. & S. F. R. Co.* v. *United States*, 284 U. S. 248 (1932);[6] or reviewing denials of petitions for reopening, see, *e. g.*, *Radio Corporation of America* v. *United States*, 341 U. S. 412, 420–421 (1951); *Acker* v. *United States*, 298 U. S. 426, 432–433 (1936); *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 47–49 (1936); *United States* v. *Northern Pacific R. Co.*, 288 U. S. 490, 492–494 (1933); see also *INS* v. *Rios-Pineda*, 471 U. S. 444 (1985); *INS* v. *Jong Ha Wang*, 450 U. S. 139 (1981). In many of these cases we have stressed the limited role courts play in reviewing agency denials of reopening; but, until today, we have never held that the courts lack jurisdiction to review the decisions at all.[7] As Judge Friendly put it:

---

[6] The Court is correct in observing that *Atchison, T. & S. F. R. Co.* "was 'promptly restricted . . . to its special facts, . . . and . . . stands virtually alone.'" *Ante*, at 278, quoting *ICC* v. *Jersey City*, 322 U. S. 503, 515 (1944). But the unique aspect of the case is that it *reversed* the agency action—not that it *reviewed* the agency action.

[7] In *Califano* v. *Sanders*, 430 U. S. 99 (1977), the Court held that judicial review was unavailable from the Secretary of Health, Education, and Welfare's final decision not to reopen a claim for benefits. The Court rested this holding on the statutory language there, which provides that an individual may seek review by commencing a civil action within 60 days "after any final decision of the Secretary made after a hearing." 42 U. S. C. § 405(g). The Court explained that "[t]his provision clearly limits judicial review to a particular type of agency action, a 'final decision of the Secretary made after a hearing.'" 430 U. S., at 108. A denial of a petition for reopening did not satisfy this language, and the Court felt compelled "to respect" Congress' choice. *Ibid.* Similarly, in *SEC* v. *Louisiana Public Service Comm'n*, 353 U. S. 368 (1957), the Court held that the specific judicial review language in 15 U. S. C. § 79k(b), which dealt with Commission orders that "revoke or modify" a previous order, restricted judicial review to the orders listed in the statute. Neither *Sanders* nor *Louisiana Public Service Comm'n* is relevant here for no such restrictive language applies to review of ICC decisions under the Hobbs Act.

The Court's citation of Court of Appeals decisions supporting its nonreview position, *ante*, at 280, is not at all conclusive. Many decisions have held that such petitions are indeed reviewable. See *Carter/Mondale Presidential Committee, Inc.* v. *FEC*, 249 U. S. App. D. C. 349, 353–354, 775

"The fact that reopening is a matter of agency discretion to a considerable extent . . . does not lead inevitably to a conclusion that such an exercise of administrative power is wholly immune from judicial examination; § 10 (e) of the APA expressly authorizes the courts to set aside any administrative decision constituting an abuse of discretion. The question is whether the Secretary in deciding not to reopen enjoys absolute discretion . . . . Absent any evidence to the contrary, Congress may rather be presumed to have intended that the courts should fulfill their traditional role of defining and maintaining the proper bounds of administrative discretion." *Cappadora* v. *Celebrezze*, 356 F. 2d 1, 5–6 (CA2 1966).[8]

The Court brushes off the many cases reviewing denials of petition for reopening by distinguishing between petitions for reopening based upon new evidence or changed circumstances and those based upon claims of material error.

F. 2d 1182, 1186–1187 (1985); *Wausau* v. *United States*, 703 F. 2d 1042 (CA7 1983); *Virginia Appalachian Lumber Corp.* v. *ICC*, 197 U. S. App. D. C. 13, 19, 606 F. 2d 1385, 1391 (1979); *Provisioners Frozen Express, Inc.* v. *ICC*, 536 F. 2d 1303, 1305 (CA9 1976); *B. F. Goodrich Co.* v. *Northwest Industries, Inc.*, 424 F. 2d 1349, 1355 (CA3), cert. denied, 400 U. S. 822 (1970); *Northeast Broadcasting, Inc.* v. *FCC*, 130 U. S. App. D. C. 278, 287–288, 400 F. 2d 749, 758–759 (1968). Cases reviewing denials of reopening in the immigration context are too common to require citation.

In *Provisioners Frozen Express, supra,* the court dealt with a petition for review which, like the one here, had been filed more than 60 days after the initial decision, but within 60 days of the petition for reopening. The court held that the Commission's refusal to entertain the petition for reopening "did not create a new final order which would give the Court jurisdiction to review some five years of proceedings in this matter." *Id.,* at 1305. But, the court hastened to add, it did have jurisdiction to determine "whether the Commission abused its discretion in rejecting [the] petition to reopen." *Ibid.*

[8] Although, given the intervening decision in *Sanders, supra,* this case is no longer good law with respect to review of Social Security determinations, Judge Friendly's discussion on the general issue of denials of petitions to reopen continues to merit our respect.

*Ante*, at 278–280. According to the Court, denials of petitions for reopening that involve allegations of "new evidence" or "changed circumstances" are reviewable. Similarly, decisions reached after reopening are reviewable, even if the agency merely reaffirms its earlier decision. But, the Court proclaims, denials of petitions to reopen that allege only material error are not reviewable. Whether or not such a distinction might be reasonable, it is nevertheless a pure creature of judicial invention. I am unable to join such a creative reading of the plain language of the Hobbs Act.[9]

The Court's reliance on 5 U. S. C. § 701(a)(2) for the proposition that denials of petitions for reopening are nonreviewable because they are "committed to agency discretion by law" is conclusively rebutted by the Court's own analysis. If denials of petitions to reopen based on material error are discretionary then so are denials of petitions to reopen based on new facts or changed circumstances. Yet the Court concedes, as it must, that denials of petitions claiming new facts or changed circumstances *are* reviewable, notwithstanding the discretionary element. *Heckler* v. *Chaney*, 470 U. S. 821 (1985), does not speak to this issue. Unlike a prosecutor's or an agency's decision not to take enforcement action, there is no dearth of "judicially manageable standards" in this context. Nor is there any basis for the Court's ability to "perceive that a . . . tradition of nonreviewability exists with regard to refusals to reconsider for material error." *Ante*, at 282. I am not sure what the Court's source for this tradition is, but it is surely not to be found in the decisions of the courts or in anything that Congress has said.

It seems clear to me that neither the Hobbs Act nor the Administrative Procedure Act recognizes the distinction that

---

[9] The only statute other than the Hobbs Act that the Court refers to on this matter is 49 U. S. C. § 10327(i) which specifies when an ICC order becomes final. That provision does not speak to the question of what types of orders are reviewable, and I do not read the Court's opinion as relying on it.

the Court creates today. Thus, I am compelled to conclude, as the ICC itself recognizes, see Supplemental Memorandum for ICC 4, that the petitions for review in this case were timely, but only for the purpose of reviewing the Commission's orders denying clarification and reconsideration.

## II

The Commission's decisions denying the petitions for clarification and reconsideration in this case were based partly on discretionary considerations and partly on the Commission's interpretation of the relevant law. The Commission read the statute as not requiring it to make a "necessity" finding (which it had not made), and concluded that any deficiencies in the "public interest" findings that it was required to make (and had made) were attributable to the unions' failure to raise the issue in the initial proceeding. I believe that the Commission's legal conclusion was sound, and that it did not abuse its discretion in refusing to consider facts and theories that the unions could have brought up in their original objections to the transactions.

The petitions for clarification and reconsideration apparently were prompted by the unions' belated realization that the Missouri-Kansas-Texas Railroad Co. (MKT) and the Denver and Rio Grande Western Railroad Co. (DRGW) believed that they had the right to use their own crews to operate trains pursuant to their newly granted trackage rights over the Union Pacific Railroad Company's (UP) and Missouri Pacific Railroad Company's (MP) tracks. The unions argued that the Railway Labor Act (RLA), certain provisions of the Interstate Commerce Act (ICA), and their collective-bargaining agreements, gave UP and MP employees certain rights with respect to working those tracks. The MKT and DRGW, on the other hand, argued that even if such rights existed, the ICC had approved MKT's and DRGW's applications for trackage rights, and the applications had specified that the two railroads had the right to utilize their own

crews. In light of the ICC's approval, the railroads concluded, they were exempt under 49 U. S. C. § 11341 from any conflicting law on the question of who would crew the trains. That statute provides:

"A carrier, corporation, or person participating in [an] approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction."

In its denials of the petitions for clarification and reconsideration, the ICC rejected the unions' argument that in order for the exemption provision of § 11341 to come into play, the ICC must make an actual, on the record, determination that the exemption is "necessary" to the transaction. The Commission explained:

"The terms of Section 11341 immunizing an approved transaction from any other laws are self-executing and there is no need for us expressly to order or to declare that a carrier is specifically relieved from certain restraints. *See Brotherhood of Loc. Eng.* [ v. *Chicago & N. W. R. Co.*, 314 F. 2d 424, 430–431 (CA8), cert denied, 375 U. S. 819 (1963)], citing *Chicago, St. P., M. & O. Ry. Lease*, 295 I. C. C. 696, at 432 (1958).

"In evaluating a transaction under the criteria of 49 U. S. C. 11344, we must consider the policies of statutes other than the Interstate Commerce Act to the extent that those policies are relevant to the determination of whether a proposal is consistent with the public interest. For example, the public interest evaluation must include consideration of the policies of the antitrust laws. *See McLean Trucking Co.* v. *United States*, 321 U. S. 67, 87 (1944).

"While the RLA, like the antitrust laws, embodies certain public policy considerations, the Interstate Commerce Act also specifies that interests of affected employees must be considered. In these proceedings, we gave full consideration to the impact of the consolidation on railroad employees in accordance with our established policies. 366 I. C. C. 618–22.

"The record in these proceedings is devoid of any suggestion by BLE, UTU, or any other party that the approval of the responsive trackage rights applications, subject to the usual labor protective conditions, would be in any way inconsistent with the policies of the RLA. In these circumstances, we can find no merit in UTU's argument that we improperly failed to reconcile the policies of the RLA with our decision." App. to Pet. for Cert. in No. 85–793, pp. A44–A45.

The Court of Appeals reversed, rejecting the ICC's argument that § 11341 is self-executing and that the Commission need not make any explicit necessity findings. 245 U. S. App. D. C. 311, 320, 761 F. 2d 714, 723 (1985). The court explained that "Congress has given ICC broad powers to immunize transactions from later legal obstacles, but this delegation by Congress is explicitly qualified by a necessity component. . . . In exercising its waiver authority ICC must do more than shake a wand to make a law go away. It must supply a reasoned basis for that exercise of its statutory authority." *Ibid.* Because it did not believe that the ICC had supplied justification for the necessity of waiving any RLA provisions regarding crew selection, the Court remanded the case for the ICC to determine whether it should "exercise its exemption authority." *Id.*, at 322, 761 F. 2d, at 725. Judge MacKinnon dissented, arguing that the statute is self-executing, and that the ICC is not required to make

any finding of necessity. *Id.*, at 326–332, 761 F. 2d, at 729–735.[10]

The Court of Appeals' holding was based on a misunderstanding of § 11341. That statute, as its plain language indicates, does not condition exemptions on the ICC's announcing that a particular exemption is necessary to an approved transaction. Rather, § 11341 automatically exempts a person from "other laws" whenever an exemption is "necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." The breadth of the exemption is defined by the scope of the approved transaction,[11] and no explicit announcement of exemption is required to make the statute applicable. As this Court explained with reference to § 11341's predecessor:

> "[A]pproval of a voluntary railroad merger which is within the scope of the Act is dependent upon three, and upon only three, considerations: First, a finding that it 'will be consistent with the public interest.' (§ 5 (2)(b).) Second, a finding that, subject to any modification made by the Commission, it is 'just and reasonable.' (§ 5 (2) (b).) Third, assent of a 'majority . . . of the holders of the shares entitled to vote.' (§ 5 (11).) When these

---

[10] Judge MacKinnon also dissented from the Court of Appeals' holding that the petition was filed within sufficient time as to call into question the ICC's initial decision. 245 U. S. App. D. C., at 322–326, 761 F. 2d, at 725–729.

[11] There may, of course, be some limitations on the types of matters the ICC can approve as part of a transaction. See *Palestine* v. *United States*, 559 F. 2d 408, 414 (CA5 1977), cert. denied, 435 U. S. 950 (1978) (looking at whether ICC approval was "germane to the success of the . . . transaction"). The Commission stated in this case that "[p]rovisions of trackage rights agreements designating which carrier's employees will perform trackage rights operations are material terms of the agreement." App. to Pet. for Cert. in No. 85–793, p. A50. In his dissent, Judge Mac-Kinnon elaborated on this point. 245 U. S. App. D. C., at 329, 761 F. 2d, at 732.

conditions have been complied with, the Commission-approved transaction goes into effect without the need for invoking any approval under state authority, and the parties are relieved of 'restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved . . . .' (§ 5 (11).)." *Schwabacher* v. *United States*, 334 U. S. 182, 194 (1948).

See also *Seaboard Air Line R. Co.* v. *Daniel*, 333 U. S. 118, 124 (1948) (not necessary for Commission's order to manifest "a clear purpose to authorize the exemption"); 49 U. S. C. § 11344(b) (listing items that Commission must consider in evaluating mergers). The present statute is no different in this respect; the exemption is self-executing.[12]

---

[12] The legislative history of § 11341 supports the meaning derived from its plain language. Section 407 of the Transportation Act of 1920, ch. 91, 41 Stat. 480, authorized Commission approvals of consolidations, and included a section providing:

"The carriers affected by any order made under the foregoing provisions of this section . . . shall be, and they are hereby, relieved from the operation of the 'antitrust laws,' . . . and of all other restraints or prohibitions by law, State, or Federal, in so far as may be necessary to enable them to do anything authorized or required by an order made under and pursuant to the foregoing provisions of this section." 41 Stat. 482, amending § 5(8) of the Interstate Commerce Act.

The operative language, with its self-executing phraseology, was incorporated into the 1940 amendment and recodification of the Transportation Act. See § 7 of the Transportation Act of 1940, ch. 722, 54 Stat. 908–909, amending § 5 (11). Again, when the Act was recodified as 49 U. S. C. § 11341(a), no substantive change was affected. Pub. L. 95–473, § 3(a), 92 Stat. 1466. See H. R. Rep. No. 95–1395, pp. 158–168 (1978).

In addition, the Commission has consistently treated the exemption as automatically flowing from an approval. See, *e. g., Railway Express Agency, Inc., Notes,* 348 I. C. C. 157, 215 (1975); *Ex Parte No. 260, Revised Regulations Governing Interlocking Officers,* 336 I. C. C. 679, 681–682 (1970); *Texas Turnpike Authority Abandonment by St. Louis Southwestern R. Co.,* 328 I. C. C. 42, 46 (1965); *Chicago, St. P., M. & O. R. Co. Lease,* 295 I. C. C. 696, 702 (1958); *Control of Central Pacific by Southern Pacific,* 76 I. C. C. 508, 515–517 (1923). A number of Courts of

Of course, as the Commission explained, in conducting the public interest inquiry under 49 U. S. C. § 11344 the Commission must consider that the legal consequence of approving the transaction as proposed will be to exempt the parties from the dictates of "other laws" to the extent necessary to carry out the transaction.[13] See *McLean Trucking Co.* v. *United States*, 321 U. S. 67, 79–88 (1944). But this is a far cry from requiring the Commission to predict exactly what type of exemptions will be required and, for each one, whether the transaction could survive absent the exemption.[14]

---

Appeals have agreed. See *Missouri Pacific R. Co.* v. *United Transportation Union*, 782 F. 2d 107, 111 (CA8 1986), cert. pending, No. 85–1054; *Brotherhood of Locomotive Engineers* v. *Chicago & N. W. R. Co.*, 314 F. 2d 424 (CA8), cert. denied, 375 U. S. 819 (1963).

[13] This does not mean, as respondents fear, that a party claiming an exemption on the basis of § 11341 need merely assert that its conduct is "necessary" in order to prevail in its claim. Any tribunal that is faced with a claim that a party is violating some "other law" has the responsibility of determining whether an exemption is "necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." 49 U. S. C. § 11341. See *Railway Express Agency, supra,* at 215–218.

[14] The Court of Appeals appeared to recognize the problems of its suggested approach when it agreed that the ICC need not "enumerate every legal obstacle that is waived in its approval," since to require the Commission to contemplate unforeseeable legal obstacles to fruition of the transaction would "undermine the approval authority's purpose of 'facilitat[ing] merger and consolidation in the national transportation system.'" 245 U. S. App. D. C. 311, 320, n. 4, 761 F. 2d 714, 723, n. 4 (1985), quoting *County of Marin* v. *United States*, 356 U. S. 412, 416 (1958). But, the court nonetheless held that the "ICC's decisionmaking process, either in the approval or in a later proceeding, must reveal evidence supporting a conclusion that waiver of a particular legal obstacle is necessary to effectuate the transaction." 245 U. S. App. D. C., at 320, n. 4, 761 F. 2d, at 723, n. 4. The idea of having parties repeatedly return to the ICC for decisions on the necessity of an exemption is without basis in the statutory scheme, and would clearly not mitigate the delay and confusion surrounding consolidations.

In its decision on the petition for reconsideration the Commission stated that it had considered the effect of the transaction on rail labor in its public interest calculations. Indeed, the original decision approving the transactions included a four-page discussion about its effect on labor, see *Union Pacific—Control—Missouri Pacific, Western Pacific*, 366 I. C. C. 462, 618–622 (1982)—issues the Commission is explicitly required to consider pursuant to 49 U. S. C. § 11344(b), and 49 U. S. C. § 11347 (1982 ed., Supp. III). Generally, the Commission concluded that the "transactions will directly benefit labor both by producing a substantial net increase in existing and future employment opportunities and by increasing the job security of their present employees." 366 I. C. C., at 619. To be sure, as the Commission itself recognized in its denial of the motion for reconsideration, it never explicitly considered the public interest ramifications of displacing any RLA provisions involving whose crew should be used in the newly granted trackage rights. But the ICC explained that it had not considered that issue because none of the unions had ever suggested that anything proposed by the railroads, including the MKT's and DRGW's use of their own crews, would be inconsistent with the RLA.

It is on this last point that the special considerations involving review of an agency's refusal to reopen a matter come into play. The agency clearly has the right to deny reopening to a party who failed to present evidence or to raise an objection that could have been presented or raised before the agency's initial decision was reached.[15] Indeed, even at the

---

[15] I find no merit in respondents' suggestion that they had no notice that the Commission might consider allowing the MKT and DRGW to use their own crews in connection with their newly acquired trackage rights. Although the Commission's approval may have been ambiguous on this issue (the Commission does not think it was), the trackage rights proposals submitted by the MKT and DRGW explicitly stated that the railroads wished to be allowed to use their own crews. See *ante*, at 273–274; see also *Missouri Pacific R. Co., supra*, at 112; App. to Pet. for Cert. in No. 85–793, pp. A45–A50. The ICC's conclusion that the unions should have been

time of the petition for clarification, the Commission did not believe that the unions had adequately supported their contention that the RLA had anything to say about the trackage rights issue.[16]   Similarly, the Commission declined to address the other issues that the unions raised, such as whether MKT's and DRGW's use of their own crews violated the terms of the labor protective conditions that the Commission had imposed in the approval order.   See App. to Pet. for Cert. in No. 85–793, pp. A45–A50 (discussing the terms imposed pursuant to *New York Dock R. Co. — Control — Brooklyn Eastern Dist.*, 360 I. C. C. 60 (1979), and *Norfolk & Western R. Co. — Trackage Rights — BN*, 354 I. C. C. 605 (1978), as modified by *Mendocino Coast R. Co. — Lease and Operate*, 360 I. C. C. 653, 664 (1980)).   Surveying the many opportunities that the unions had to raise objections to the trackage rights proposals during the proceedings, the Commission concluded:

> "BLE, UTU, and various other railway labor organizations participated in these proceedings, and none made any argument or presented any evidence that the responsive trackage rights proposals would violate any applicable labor agreement.   Rather, the record supports the conclusion that the trackage rights operations, using the tenants' crews, could be implemented as approved without raising any dispute over crew assignments between the employees of different railroads." App. to Pet for Cert. in No. 85–793, p. A45.

It is thus clear that the agency's refusal to take action based on the unions' new claim that the use of the tenants' crews conflicted with various laws was based on the premise that

---

aware of the terms of the proposals is entitled to substantial deference, resting as it does on the intricacies of practice before the Commission.

[16] The Commission prefaced its discussion of the § 11341 issue by concluding that the unions had not adequately demonstrated that "the trackage rights agreements . . . involve a change in UP-MP employees' working conditions in a manner contrary to RLA requirements." *Id.*, at A43.

the unions had, so to speak, procedurally defaulted on those claims. There is no basis for concluding that this decision constituted an abuse of discretion.

I would therefore reverse the Court of Appeals on these grounds, not because it lacked jurisdiction.