**Kevin JOST, et al., Petitioners,**

**v.**

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

---

Central Kansas Railway, Limited
Liability Company,
Intervenor.

No. 99–1054.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 4, 1999.

Decided Oct. 22, 1999.

Nels J. Ackerson argued the cause and filed the briefs for petitioners.

Troy W. Garris, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the brief were Henri F. Rush, General Counsel, and Ellen D. Hanson, Deputy General Counsel, and M. Alice Thurston, Attorney, United States Department of Justice.

Thomas F. McFarland, Jr. was on the brief for intervenor.

Before: EDWARDS, Chief Judge, WALD and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Kevin Jost petitions for review of an order of the Surface Transportation Board ("the Board") declining to reopen a proceeding wherein the Board issued a notice of interim trail use ("NITU") for a railroad line formerly operated by the Central Kansas Railway ("CKR").[1] Jost sought to reopen the proceeding on the grounds that, as a result of right-of-way sales by CKR, CKR's notice of exemption was void for misleading statements, rail banking and interim trail use were not possible, and CKR had abandoned the line. Jost also challenged the Board's refusal to review the financial fitness of the Central Kansas Conservancy ("CKC" or "the Conservancy"), the trail sponsor that acquired the line from CKR.

We uphold the Board's decision not to review the fitness of the Conservancy to be a trail sponsor. However, we find that the Board has not adequately explained why Jost's evidence concerning the right-of-way sales did not require reopening the proceeding. Accordingly, we grant the petition for review and remand to the Board for further proceedings.

## I. BACKGROUND

As part of its jurisdiction over the common carrier responsibilities of railroads, the Surface Transportation Board must approve the abandonment of a railroad line.[2] Pursuant to a statutory mandate, the Board has established an abbreviated process for abandonment of "out-of-service" lines.[3] See 49 U.S.C. § 10502 (Supp.

---

1. Jost's petition is joined by Alvin Kroupa, Allen Schlehuber, and the Citizens Association of Marion and McPherson Counties. For convenience, we will refer to petitioners simply as "Jost."

2. Once abandonment occurs, "as a general proposition [the agency's] jurisdiction termi-

nates." Preseault v. ICC, 494 U.S. 1, 5–6 n. 3, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).

3. A line is considered "out-of-service" if "no local traffic has moved over the line for at least 2 years and any overhead [i.e., through] traffic on the line can be rerouted over other

III 1998); 49 C.F.R. § 1152.50 (1998). When a railroad files a verified "notice of exemption" stating it wishes to abandon an out-of-service line, the Board publishes a notice in the Federal Register which states that the railroad will be authorized to abandon the line in thirty days, unless the Board stays the exemption pursuant to a petition.[4] The notice also states that the exemption is void *ab initio* if the railroad's notice contains false or misleading information. *See* 49 C.F.R. § 1152.50(d)(3).

At this point, the "rails-to-trails" program established under the Trails Act, 16 U.S.C. § 1247(d), may come into play. The Trails Act authorizes the Board "to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreation trails." *Preseault v. ICC*, 494 U.S. 1, 6, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). Thus, the Trails Act has two goals, to preserve railroad rights-of-way and to encourage the creation of new recreation trails. *See Preseault*, 494 U.S. at 17–18, 110 S.Ct. 914.

The Trails Act comes into play if, while the exemption is pending, a private organization files a "statement of willingness" with the Board. The statement of willingness is an indication that the private organization (the "trail sponsor") is willing to take over management of and financial responsibility for the right-of-way, for the purposes of "rail banking" the line and establishing a trail on the right-of-way.[5] If the railroad indicates its willingness to negotiate transfer of the line to the trail sponsor, then the Board will issue a notice of interim trail use ("NITU"). Under the NITU, the authorization to abandon the

line is stayed for a set period of time and the railroad is instead authorized to transfer the line for rail banking and interim trail use. If the parties' negotiations are successful, then the line is conveyed for interim trail use and possible future rail service. If the negotiations are unsuccessful, then the railroad's exemption takes effect, and the line may be abandoned. Whether the negotiations over interim trail use are successful or not, the Board need not reopen the proceeding once the NITU is issued.[6]

In February 1996, the Central Kansas Railway sought to abandon a 33.4 mile rail line that it owned largely as easements over land belonging to others. CKR filed a notice of exemption with the Board, indicating that the line qualified as "out-of-service." The Board published a notice in the Federal Register stating that the exemption would be effective April 12, 1996, unless the Board took further action. *Central Kansas Ry., LLC—Abandonment Exemption—in Marion & McPherson Counties, KS*, 61 Fed.Reg. 10,428, 10,429 (1996). The notice also states that the exemption would be void *ab initio* if CKR's notice contained false or misleading information. *Id.*

On April 9, 1996, CKR indicated to the Board that it had not abandoned the line and was willing to negotiate rail banking-interim trail use with an entity (Jennings & Co.) that had filed a statement of willingness to assume responsibility for the line. On April 12, 1996, the Board issued a notice of interim trail use and stayed the exemption for six months. The Board subsequently granted two additional exten-

---

lines" and no complaints about reduced rail service are pending or have been decided adverse to the railroad in the prior two years. 49 C.F.R. § 1152.50(b) (1998).

**4.** Once the exemption becomes effective, the railroad is authorized to abandon the line. Under current regulations, the railroad must file a notice with the Board to consummate abandonment. *See* 49 C.F.R. §§ 1152.50(e), 1152.29(e)(2).

**5.** "Rail banking" refers to the preservation of the right-of-way for possible future reinstitution of rail service. In addition to private organizations, state and local governments may also serve as trail sponsors. *See* 16 U.S.C. § 1247(d) (Supp. III 1998).

**6.** However, on request of the parties, the Board will reopen the proceeding to grant further stays of the exemption to allow the parties more time for negotiations.

sions of time for the parties to negotiate rail banking-interim trail use. In June 1997, the Central Kansas Conservancy also filed a statement of willingness and requested a NITU. On June 12, 1997, in its final action in this proceeding (other than the denial of the petition to reopen), the Board decided to issue a NITU and to postpone the effective date of the exemption until December 13, 1997. On September 19, 1997, pursuant to this NITU, the railroad conveyed the 33.4 mile line to the Conservancy for rail banking-interim trail use.

On September 25, 1997, Jost, who owns land over which the line passes, filed a petition to reopen the abandonment proceeding on the grounds of material error and changed circumstances. Jost stated that both before and after filing its notice of exemption, CKR had conveyed portions of the right-of-way, which rendered the line unsuitable for rail banking, and therefore for interim trail use. Jost argued that CKR's failure to disclose these sales caused the Board to erroneously issue a NITU. Jost also stated that CKR's conveyance of portions of the right-of-way, together with the lack of service on the line and the removal of rails, ties, and ballast, showed that CKR had consummated abandonment of the line. Finally, Jost argued that changed circumstances, *i.e.*, recent expressions of opposition to interim trail use by local governments, indicated that the Conservancy would be unable to meet its financial obligations for trail management.

CKR responded to Jost's filings by stating that, although it had conveyed back some right-of-way along the line, it had retained sufficient right-of-way in all sales to allow for rail banking-interim trail use.[7] Since the right-of-way sales did not impact rail banking or interim trail use, CKR argued it was not misleading to omit them.

Jost responded by arguing that CKR had not simply conveyed "excess" right-of-way. Jost presented affidavits stating that, in three places, CKR had sold the entire, or "fullwidth," right-of-way, breaking up the continuity of the line. CKR replied that the deeds in question were facially ambiguous, and that it believed it had only conveyed excess right-of-way.[8]

The Board denied Jost's petition to reopen the abandonment proceeding. The Board concluded that CKR's discontinuance of service and removal of rails, ties and ballast did not consummate abandonment, particularly in light of CKR's ongoing negotiations over rail banking-interim trail use. *Central Kansas Ry., LLC— Abandonment Exemption—in Marion & McPherson Counties, KS,* (Docket No. AB–406) (Sub.-No. 6X) (Dec. 19, 1998) ("*CKR—Abandonment Exemption*"), slip op. at 3 (citing *Birt v. STB,* 90 F.3d 580 (D.C.Cir.1996)). The Board also found that Jost had not made a specific showing that the Conservancy would be unable to meet its financial obligations, and therefore the Board would not reopen the proceeding to examine the Conservancy's financial capacity.

Finally, the Board stated:

---

7. The pre-sale right-of-way width was from 100–300 feet. The post-sale right-of-way width, according to CKR, was from 50–230 feet. Right-of-way as little as 30 feet wide has been found to be sufficient for safe rail operations. *See Boston & Maine Corp. & Springfield Terminal Ry. Corp.—Abandonment & Discontinuance of Service in Hartford County, CT in the Matter of a Request to Set Terms & Conditions,* (Docket No. AB–32) (Sub.-No. 43) (Aug. 9.1991) (citing examples of 30–, 30– and 50–foot wide rights-of-way, but noting that question is highly fact specific). Thus, CKR contends it only sold "excess" right-of-way.

8. The description of property to be conveyed in each case was a map which contained both a written description and a yellow-shaded area indicating what was to be conveyed. However, the written description was inconsistent with the amount of right-of-way within the yellow-shaded area. CKR submitted affidavits that its intent was to sell only the amount indicated within the yellow-shaded area, and not the entire amount of right-of-way in the written description.

CKR has refuted these allegations [that the right-of-way sales made interim trail use and rail banking impossible] by submitting a verified statement specifically stating that a sufficient width of right-of-way was conveyed to CKC in all instances to permit trail use and to permit rail service to be reinstituted for the entire length of the right-of-way should there be an occasion for reestablishment of such rail service in the future. Moreover, while all of the parties' filings will be accepted into the record, we will not attempt to resolve all of the property issues that these filings raise. State courts appear to be the proper place for parties to resolve property disputes about the parties' expectations and how much property has been transferred and how much has been retained.

*Id.* at 5. The Board did not directly address Jost's contention that the right-of-way sales rendered the notice of exemption misleading and false, or that the right-of-way sales were evidence of abandonment.

Jost petitioned for review of the Board's decision not to reopen the proceeding, arguing that it was arbitrary and capricious for the Board not to examine whether the Conservancy was financially capable of being a trail sponsor, not to find that the notice of exemption was void *ab initio*, not to reconsider whether interim trail use was appropriate in light of the sale of portions of the right-of-way, and not to find that the line had been abandoned.

## II. Discussion

### A. Standard of Review

At the outset we must resolve the parties' disagreement over the standard of our review of the Board's decision not to reopen the proceeding. The Board contends that it is entitled to a particularly deferential standard of review, since Jost seeks review of a decision not to reopen a

prior proceeding. Jost, however, contends that the Board's decision not to reopen the proceeding was clearly arbitrary and capricious because it was flatly contrary to the Board's own regulations. We agree with neither contention.

We have recently held that "a petition seeking review of an agency's decision not to reopen a proceeding is not reviewable unless the petition is based upon new evidence or changed circumstances." *Southwestern Bell Tel. Co. v. FCC*, 180 F.3d 307, 311 (D.C.Cir.1999). *Southwestern Bell* stated that the "test for new evidence" is whether the evidence identified by petitioners are " 'facts which through no fault of [the petitioner's], the original proceeding did not contain.' " *Id.* at 312 (quoting *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 279, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987)) (alterations in original).

In this case, we cannot fault petitioners for the lack of information in the record about CKR's right-of-way sales. First, the three sales where it is alleged that "full-width" right-of-way was sold did not occur until after the notice of exemption was filed. In addition, because the grant of a NITU appears to be virtually automatic once a potential trail sponsor and a railroad indicate their willingness to negotiate interim trail use, there is very little time when a request for a NITU is pending before the Board.[9] Thus, the issuance of a NITU is not a typical agency adjudication where any interested party has an opportunity to put evidence in the record for the agency's consideration before the agency reaches its decision. We do not see this process as being inconsistent with, or an unreasonable interpretation of, the Trails Act, but we cannot fault petitioners for failing to raise the question of the right-of-way sales in the brief period in which the

9. For example, in this case, the first statement of willingness was filed April 9, 1997, and the Board decided to issue the NITU on April 11, 1997, while the second statement of willingness was filed on June 6, 1997, and the Board decided to issue a NITU on June 12, 1997.

request for a NITU was pending.[10]

It is true that the literal language of Jost's petition sought to reopen the proceeding on the grounds of "material error," which would ordinarily not be a valid basis for a petition for review. *See Locomotive Eng'rs,* 482 U.S. at 280, 107 S.Ct. 2360; *Southwestern Bell,* 180 F.3d at 311. However, Jost repeatedly indicates that the "material error" he alleges is not that the Board wrongly issued the NITU on the basis of the evidence in front of it, but rather that the Board's decision was "based on inaccurate, incomplete and misleading information provided by [CKR]." Joint Appendix ("J.A.") at 94; *see also id.* at 103 ("STB's imposition of trail use conditions on the railroad corridor was in material error because it was based on inaccurate and insufficient facts presented to the STB.").

Thus, we believe that it is clear that the purpose of Jost's petition was not to challenge the Board's reasoning but to bring new material to its attention, and therefore the decision not to reopen the proceeding is reviewable. *See Fritsch v. ICC,* 59 F.3d 248, 252 (D.C.Cir.1995) (reviewing ICC's decision not to reopen abandonment/trail condition proceeding because "[w]e . . . interpret *Locomotive Engineers* as permitting merits review of a refusal to reopen where the motion to reopen was based on non-pretextual grounds of new matter or changed circumstances, and not merely on material error in the original agency decision").

■ While we believe that the Board's decision not to reopen is reviewable, we do not accept Jost's contention that the Board was *required* to reopen the proceeding once he filed a petition containing new evidence. There is nothing in the Board's

regulations governing either petitions for reconsideration or petitions to reopen proceedings which requires, the Board to grant such a petition. *See* 49 C.F.R. §§ 1115.3, 1115.4. Accordingly, we will review the Board's decision not to reopen the proceeding under the familiar arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A).

■ "The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result. The arbitrary and capricious standard of the APA mandates that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Dickson v. Secretary of Defense,* 68 F.3d 1396, 1404 (D.C.Cir.1995) (internal quotation marks, brackets and citations omitted). "[W]e may not supply a reasoned basis for the agency's decision that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted). In this case, we can discern the agency's rationale with regard to the question of the Conservancy's fitness to be a trail sponsor. We are, however, unable to discern the agency's path in addressing CKR's sale of portions of the right-of-way.

B. *CKR's Right-of-Way Sales*

■ Jost presented three reasons why the alleged sale of fullwidth sections of the right-of-way required the Board to reconsider its decision to allow interim trail use

10. This is not to say that the timing of the petition is irrelevant. It may be that the Board is entitled to refuse to reopen a proceeding where there is evidence a petitioner slept on her rights. At oral argument, counsel for the Board suggested that the delay in raising the issue of right-of-way sales was a valid reason not to reopen this proceeding,

but there is nothing in the Board's decision which suggests that it was relying on that rationale. *See SEC v. Chenery,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (reviewing court must "judge the propriety of [agency] action solely by the grounds invoked by the agency").

over the line. First, Jost argued that the railroad's failure to disclose the sale of portions of its right-of-way constituted false and misleading information. *See* 49 C.F.R. § 1152.50(d)(3) (notice of exemption void *ab initio* if it contains false or misleading information). Second, Jost argued that the sale of full-width right-of-way would cut the rail line in two, making it impossible to "rail bank" any part of the line, and therefore making interim trail use inappropriate. Third, Jost argued that the sale of portions of the line was additional evidence that CKR consummated abandonment of the line, and therefore the Board lost jurisdiction over the line, prior to issuance of the NITU.

It appears that the sale of full-width right-of-way would be material to the Board's decision in all of these three areas. On the first issue, the Board argues in its brief that CKR's notice of exemption is not void because there was no *material* false statement. The Board relies on the fact that sale of the right-of-way would not affect CKR's ability to use the exemption proceeding to abandon the line. However, sale of fullwidth right-of-way certainly could affect CKR's ability to obtain a NITU and convey the line for interim trail use. We do not see—and the Board has not seen fit to tell us—why false statements that affect the issuance of a trail condition, if not the exemption itself, are not material to the proceeding. At oral argument, counsel for the Board also suggested that CKR may not have been under any obligation to inform the Board that it had sold off portions of the right-of-way once it filed its notice of exemption. Thus, it is possible that the notice was not void *ab initio* because at the moment it was filed it did not contain any material false statements, since the right-of-way sold up to that point was not "full-width," and did not bisect the line. However, we are extremely reluctant to accept that theory as a valid basis for upholding the Board's decision, particularly in the absence of any evidence that the Board itself relied on such a theory. In the first place, it appears that five sales of right-of-way took place before the notice of exemption was filed, and the Board never addressed the significance of those sales to the feasibility of either conversion to trail use or eventual reinstitution of rail service.[11] *See* J.A. at 117–18. Perhaps more importantly, in the absence of a definitive statement by the Board that petitioners are under no obligation to supplement a filing which becomes false or misleading due to subsequent events, such as the later sale of full-width right-of-way, we do not think counsel's statement at argument, that no regulation specifically requires updating information in the notice of exemption, is sufficient to demonstrate that the Board takes such a parsimonious and time-limited view of its own regulations barring false statements.[12] *Cf.* 49 C.F.R § 1114.29 (party engaged in discovery in a Board proceeding "is under a duty seasonably to correct his response" if he "knows or later learns that his response [to a discovery request] is incorrect"). Since the Board never discussed the false statement issue in its decision, we cannot assume that any false statements CKR may have made were not material.

As to the second issue, the effect of right-of-way sales on rail banking, we do not read the Board's decision as saying that, if full-width right-of-way sales had taken place, that fact would not be material to its decision to impose a trail condi-

---

11. Since apparently none of these sales involved "full-width" right-of-way, there might be good reason for the Board to find that the omission of these sales was not a material false statement, even as to the NITU. However, we are not willing to assume such a finding in the absence of any discussion by the Board of the question.

12. It is possible that such a limited view of what constitutes a false statement could itself be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," but we have no occasion to decide that question here. 5 U.S.C. § 706(2)(A).

tion. The Board recognized that the parties were contesting whether "CKR's [sales] have made interim trail use and rail banking impossible" and indicated that if Jost's allegations proved to be true, the Board "would revisit the issues." *CKR— Abandonment Exemption,* slip op. at 5. Again, we see no reason, and the Board's decision gives us none, why the possibility that full-width sales occurred would not be material to the Board's decision to impose a trail condition.

Finally, we also think that the sale of right-of-way is material evidence for the Board to consider in deciding whether CKR abandoned the line prior to the issuance of the NITU. We have previously indicated that "the pivotal issue" in determining whether a railroad has consummated abandonment "is the intent of the railroad—as evidenced by a spectrum of facts varying as appropriate from case to case." *Birt v. STB,* 90 F.3d 580, 585 (D.C.Cir. 1996) (internal quotation marks omitted). In this case, the Board looked to CKR's discontinuance of service, its removal of rails, ties and ballast, its negotiations over interim trail use, and its ultimate statement that it had conveyed the line for interim trail use. We can see no reason why the sale of portions of the right-of-way would not also be an appropriate fact for the Board to consider in evaluating the intentions of the railroad. It would be strange, to say the least, if the removal of rails, ties and ballast were material facts, but the sale of the entire right-of-way at a given point were not. *Cf. RLTD Ry. Corp. v. STB,* 166 F.3d 808, 812 (6th Cir.1999) (upholding Board's conclusion that "a *de facto* abandonment occurred because the line was no longer linked to and part of the interstate rail system") (internal quotation marks omitted).

13. The Board's brief similarly attempts to straddle these two approaches. In one place the brief states that "[t]he Board placed substantial weight on CKR's verified statement ... [and] concluded that petitioners had not proven that the conveyance of interests in certain lots ... makes reactivation of rail

Since the possibility that CKR had sold off full-width right-of-way was material to the issues before the Board, the Board needed to address forthrightly the issue of whether CKR did sell off full-width right-of-way, or, at least, explain why the possibility that full-width right-of-way was sold would not alter the Board's decision to issue a NITU. However, the only reference by the Board to any of these issues was the passage quoted at length above. Unfortunately, that passage is entirely too opaque to enable us to review meaningfully the Board's decision.

It is possible to read the sentence which states that "CKR has refuted [Jost's] allegations" as a factual finding by the Board, based on the affidavits in the record, that CKR had not sold full-width right-of-way. In that case, we could review the Board's finding to determine whether it had sufficient support in the record not to be arbitrary and capricious. However, in the very next sentence, the Board states that it "will not attempt to resolve all of the property issues that these filings raise," and suggests that the parties should resolve their differences in state court.[13]

The basis for an administrative action

must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left indecisive. In other words, [w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong.

*SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (internal quotation marks omitted).

service impossible." Resp'ts' Br. at 13. Elsewhere the brief suggests that the Board "declined to speculate on the outcome of a [state court] quiet-title action," *id.* at 24, and "[p]roperly [d]eferred" to a state court determination. *Id.* at 23.

In this case, we simply cannot tell what the decision means, *i.e.*, on what basis the Board concluded that Jost's evidence of the sale of full-width right-of-way did not require reopening the proceeding. It appears unlikely that the Trails Act either requires the Board to determine for itself in every case the validity of the railroad's property rights, or allows the Board to disregard totally *prima facie* evidence that the railroad no longer owned an adequate right-of-way. *Cf. Idaho N. & Pac. R.R. Co.—Abandonment & Discontinuance Exemption—In Washington & Adams Counties, ID,* Docket No. AB–433 (Sub.-No. 2X) (April 1, 1998) ("*Idaho Northern*") ("[I]f a trail use arrangement is successfully negotiated, and a landowner or other interested party presents evidence to call into question the continued application of the Trails Act, we would reopen the proceeding to afford the trail user an opportunity to demonstrate that it continues to meet the requirements of the statute.").[14] At the same time, even if some full-width right-of-way was sold, it may be that the Act authorizes interim trail use over the remaining right-of-way, assuming the Board retains jurisdiction over the line. We would defer to the Board's reasonable interpretation of what the Act requires, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), if we could discern the Board's interpretation in its decision.

Unfortunately, the Board's decision "cross[es] the line from the tolerably terse to the intolerably" elliptic. *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970). The Board needs to articulate how it proceeds when faced with an allegation that sales of full-width right-of-way have occurred, and why it believes that practice is consistent with statutory requirements governing its jurisdiction and the Trails Act. At that point, if petitioners are still dissatisfied, this court will have something to review.

If the Board was elliptic about why it need not consider whether the sales made rail banking impossible, it was mute on why it need not consider whether the sales made CKR's notice of exemption void, or constituted evidence of abandonment of the line. Again, we presume neither to suggest a rationale nor to find one in the tea leaves of the Board's opinion. We simply hold that the Board must articulate the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision.

### C. The Conservancy's Fitness to Serve as Trail Sponsor

■ The Board's treatment of Jost's challenge to its decision not to reopen the proceeding to examine the financial fitness of the Conservancy to serve as trail sponsor illustrates well the Board's ability to articulate the basis for its decision. Jost's petition, construed somewhat generously, challenged both the Board's general policy concerning financial "fitness tests" and the application of that policy to the Conservancy. In rejecting Jost's challenge, the Board clearly stated the standard it was applying, the rationale for that standard, and why the petition did not satisfy that standard.

In its decision, the Board followed and restated the policy with regard to financial "fitness tests" that was explained in *Idaho Northern.* In *Idaho Northern,* the Board indicated that it interpreted the phrase

---

**14.** We do not hold that the Board is required to resolve disputed issues of state property law, or even that the Board is necessarily required to reopen the proceeding on the evidence presented by Jost. If the Board chooses to reopen the proceeding, it may be appropriate for the Board to stay proceedings pending action in a state court. Alternatively, the Board may choose to make its own determination, subject to revision upon notice of a final state court judgment. We only require that the Board address the material issues of fact which have been raised concerning the applicability of the Trails Act in whatever way the Board finds most consistent with the language and goals of the Act.

"qualified private organization" in section 1247(d) to mean any organization willing to assume management and financial responsibility for the line in question. In this case, as in *Idaho Northern*, the Board noted that negotiation over a trail condition delays abandonment of a line, and extends the railroad's responsibility for the right-of-way. Accordingly, "the primary purpose of a fitness test would be to protect a railroad from wasting its time negotiating with an unfit trail sponsor. However, the railroad already has the ability to protect itself from that result merely by refusing to consent to the issuance of the trail condition." *CKR—Abandonment Exemption*, slip op. at 4; *see also Idaho Northern* (employing similar reasoning and noting that ten years of experience with the Act had not shown any problem with trail sponsors failing to meet their responsibilities). The Board stated that not only was a financial fitness test for trail sponsors unnecessary, but such a test would be contrary to the intent behind the Trails Act because it could have the effect of deterring or delaying interim trail use.

For these reasons, the Board applies a presumption that any private organization that files a statement of willingness meets the statutory requirement to be a trail sponsor. However, the Board's presumption that a trail sponsor is qualified is rebuttable. The Board has indicated that "if it is shown that the trail sponsor does not have the ability to continue to meet the financial and liability conditions of the statute, the trail condition would be involuntarily revoked." *CKR—Abandonment Exemption*, slip op. at 4–5.

Jost characterizes this policy as an abdication of the Board's statutory responsibilities. We disagree and conclude that the Board's policy is a reasonable interpretation of its obligation under the statute. There certainly is nothing in the statute which expresses a congressional intent contrary to the Board's practices. *Cf. Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778 ("[T]he court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress."). The Trails Act is virtually silent on what makes a private organization "qualified" to be a trail sponsor. The Act is clear, however, that the Board "shall" impose a trail condition, and not permit abandonment of a line, whenever a railroad is prepared to convey the right-of-way to an organization that is "prepared to assume full responsibility" for management of the line, for liability, and for taxes owed. 16 U.S.C. § 1247(d) (Supp. III 1998); *see also Goos v. ICC*, 911 F.2d 1283, 1295 (8th Cir.1990) (statute gives agency "little, if any, discretion to forestall a voluntary agreement to effect a conversion to trail use"). It is certainly reasonable for the Board to draw from the Act a congressional intent "to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreation trails," *Preseault*, 494 U.S. at 6, 110 S.Ct. 914, and to carry out its mandate in ways that further, rather than unnecessarily hinder, those goals. The Board's explanation of why a presumption of fitness is consistent with the goals of the Act is reasonable. *See CKR—Abandonment Exemption*, slip op. at 4 ("A railroad presumably would not agree to negotiate with a prospective trail sponsor unless the railroad believes the trail sponsor will be able to manage the right-of-way and assume legal liability and pay taxes. ... Pending an agreement with the proponent of any interim trail, or the consummation of the abandonment, the right-of-way remains the responsibility of the railroad. Thus, the carrier is the most appropriate party to determine whether any offer is likely to prove successful both in meeting the railroad's desires and in fulfilling the statutory and regulatory liability requirements of the Trails Act. Requiring the proponent of a trail ... to pass a fitness test whenever the Board issues a trail condition could deter or delay interim trail use, which would be contrary to Congress' intent to facilitate and encourage rail banking and interim trail use ....") (citation omitted). In short, we believe

the Board's use of a rebuttable presumption in these circumstances is a reasonable interpretation of the Trails Act, and, therefore, we will not overturn it.[15] *See Chevron,* 467 U.S. at 845, 104 S.Ct. 2778.

 Having found the Board's policy to be reasonable under the statute, the next question is whether the Board's application of that policy in this case was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Jost argues that he presented sufficient information to rebut the presumption that the Conservancy was capable of meeting its responsibilities as trail sponsor. The information Jost presented was that three local governments had expressed their opposition to interim trail use, and also that Kansas state law would impose substantial responsibilities on a trail sponsor, such as weed and litter control, and the installation of signs and fencing.

The Board found that "there has been no specific showing here that the trail sponsor has not met, or likely will not be able to meet, its financial obligations regarding this trail." *CKR—Abandonment Exemption,* slip op. at 5. The Board stated that "the Trails Act does not require a trail to be 'developed' in any particular way" and "there is no absolute time limit for how quickly a trail must be developed to its intended level of use." *Id.*

We see no basis for finding that this conclusion was arbitrary or capricious. Jost offered nothing but speculation that the Conservancy would be unable to meet its responsibilities. The Conservancy never indicated to the Board that it was relying on local governments for funding, so it is not clear why their opposition should raise any inference that the Conservancy could not raise needed funds. In the absence of any real evidence that the Conservancy was failing to meet, or would fail to meet, its responsibilities, there is no reason to believe that the presumption of financial fitness had been rebutted. Ac-

cordingly, we will uphold the Board's decision not to examine the Conservancy's fitness to be a trail sponsor.

### III. Conclusion

We conclude that the Board's decision not to reopen the proceeding to examine Central Kansas Conservancy's fitness to be a trail sponsor was not arbitrary and capricious. However, because we are unable to discern the basis for the Board's decision that it was unnecessary to reopen the proceeding to consider Central Kansas Railway's right-of-way sales, we remand this case to the Board for further proceedings consistent with this opinion.

*So ordered.*

---

**15.** Similarly, we see nothing in the Trails Act that requires the Board to license petitioners to engage in discovery of the financial fitness of potential trail sponsors.