# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 27, 2005        Decided March 24, 2006

No. 04-1359

AMERICAN ASSOCIATION OF PAGING CARRIERS,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*Kenneth E. Hardman* argued the cause for the petitioner.

*C. Grey Pash, Jr.*, Counsel, Federal Communications Commission, argued the cause for the respondent. *Robert H. Pate, III*, Assistant Attorney General, *Catherine G. O'Sullivan*, Counsel, and *Andrea Limmer*, Attorney, United States Department of Justice, and *Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission were on brief. *John A. Rogovin* and *Roberta L. Cook*, Counsel, Federal Communications Commission, entered appearances.

Before: HENDERSON, GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The American Association of Paging Carriers (AAPC), a trade association representing paging signal carrier companies, seeks review of the September 2004 Memorandum Opinion and Order of the Federal Communications Commission (FCC or Commission) in *Amendment of Part 90 of the Commission's Rules and Policies for Applications and Licensing of Low Power Operations in the Private Land Mobile Radio 450–470 MHz Band*, 19 F.C.C.R. 18501 (2004), *reprinted at* Joint Appendix (JA) 8a (Denial Order). In the Denial Order, the FCC denied AAPC's petition to reconsider parts of an earlier rulemaking that revised the channeling plan in the 450–475 MHz band of the radio spectrum, designating eight frequencies in the 462 MHz band for low power communications operations. *See Report and Order*, 18 F.C.C.R. 3948 (2003) (Low Power Order). AAPC claims that by allocating for low power use eight frequencies located at an unacceptably close distance of only 12.5 kHz from existing paging-only frequencies already designated for use by AAPC's members, the FCC violated the requirement set out in the 1993 Omnibus Budget Reconciliation Act (OBRA), Pub. L. No. 103-66, 107 Stat. 312, mandating that the Commission make "necessary and practical" modifications to ensure that technical requirements applicable to licensees such as AAPC's members are "comparable" to those applicable to licensees providing "substantially similar" services. OBRA § 6002(d)(3)(B). Specifically, AAPC claims that the Low Power Order failed to carry out the unambiguous congressional intent expressed in OBRA that like communications services be treated alike. Because we find the Denial Order unreviewable, however, we dismiss AAPC's petition.

3

I.

*A. Regulation of Commercial Paging Signal Licensing*

Paging services allow both commercial subscribers and internal (or "private"[1]) networks of users to receive messages broadcast by radio waves over dedicated frequencies. Historically, the FCC allocated frequencies for paging operations under two parts of its rules. Part 22 covered the traditional common carrier paging services available to the public known as Public Mobile Services (Part 22 systems), *see* 47 C.F.R. § 22.99, while Part 90 covered the private paging carrier services known as Private Land Mobile Radio Services (Part 90 systems), including point-to-point private radio services tailored to the needs of particular user groups for internal use—and not subject to common carrier regulation—such as safety operations (e.g., roadside assistance and volunteer fire departments), systems used by school bus drivers or for disaster relief and businesses requiring specialized internal paging services like private ambulance companies. *See* 47 C.F.R. §§ 90.15, 90.20. With a growing demand for private service, however, the Commission began authorizing licensees to provide "private carrier" service, i.e., service to third-party users on a for-profit basis, under Part 90.[2] *See Inquiry Relative to the*

---

[1] "Private" in this context refers not to the licensee's status but to the use of the paging network; a private system broadcasts signals for internal use only. A private paging system can therefore be operated by either a private (i.e., commercial) or a public (i.e., government) licensee.

[2] Unlike private licensees, who use their networks strictly for internal communications, private carrier service providers offer paging services to third parties.

*Future Use of the Frequency Band 806-960 MHz, Second Report and Order*, 46 F.C.C.2d 752, 755 ¶¶ 6–10 (1974); *Implementations of Sections 3(n) and 332 of the Communications Act, Second Report and Order*, 9 F.C.C.R. 1411, 1414 ¶ 4 (1994). As private carrier service was offered to third parties for profit, and as the FCC permitted private land mobile service operators to interconnect with the public telephone network and thereby provide the same service traditionally offered by common carriers only, private carriers became indistinguishable from common carriers. Nevertheless the two remained subject to separate regulatory schemes. *See* H.R. Rep. No. 103–111, at 259–60 (1993). Common carriers were subject to rate regulation on both state and federal levels, for example, while private carriers were not. *Id.* at 260.

In August 1993, the Congress enacted the Omnibus Budget Reconciliation Act (OBRA). Pub. L. No. 103-66, 107 Stat. 312 (1993). Seeking to establish a single regulatory framework for all for-profit mobile radio licensees offering services to the public and a different framework for private licensees, OBRA amended section 332 of the Communications Act of 1934. OBRA section 6002(b) modified the regulation of all mobile radio services, including paging services, by creating two statutorily defined categories of mobile services: commercial mobile radio services (CMRS) and private mobile radio services (PMRS). It defined CMRS as "any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public." *See* 47 U.S.C. § 332(d)(1). In response to this congressional mandate, the FCC concluded that all existing common carrier mobile radio services operating under Part 22 of its rules, including common carrier paging services, and a number of the then-private radio services operating under Part 90 of its rules,

including private carrier paging services provided by AAPC members, would now be subject to the new CMRS classification.[3] *Implementations of Sections 3(n) and 332 of the Communications Act, Second Report and Order*, 9 F.C.C.R. at 1452–53 ¶ 97. Through OBRA the Congress also sought to ensure that Part 90 licensees receive substantially similar regulatory treatment as the Part 22 licensees with which they now share the CMRS classification by providing that the Commission, "in the regulations that will, after such date of enactment, apply to a service that was a private land mobile service and that becomes a commercial mobile service (as a consequence of such amendments), shall make such other modifications or terminations as may be necessary and practical to assure that licensees in such service are subjected to technical requirements that are comparable to the technical requirements that apply to licensees that are providers of substantially similar common carrier services." OBRA § 6002(d)(3)(B).

---

[3] Other existing private land mobile services regulated under Part 90 like government, public safety and certain specialized industrial services did not come within the CMRS definition and were therefore classified as PMRS services. Regarding the private paging services offered by AAPC members, however, the FCC "determined that [its] private land mobile service rules allow (although they do not require) [private paging] licensees to offer for-profit, interconnected service to the public or a substantial portion of the public, thus meeting the CMRS definition. We therefore concluded that licensees in these Part 90 service categories who are in fact providing such service would be classified as CMRS, while Part 90 licensees whose operations do not meet the CMRS definition would continue to be classified as private." *Further Notice of Proposed Rulemaking, Implementations of Sections 3(n) and 332 of the Communications Act, Second Report and Order*, 9 F.C.C.R. 2863, 2864 ¶ 3 (1994).

*B. Procedural History*

AAPC challenges the FCC's revision of existing policies governing low power operations in the 450–470 MHz land mobile radio frequency bands.[4] Regular channels employing high-power transmissions in these bands are normally spaced 25 kHz apart.[5] Recognizing the need for low power operations while at the same time encouraging efficient spectrum use,[6] however, the FCC in March 2003 made certain "offset channels"—frequencies only 12.5 kHz removed from the 25 kHz frequencies—available for low power operations.[7]

---

[4] "Land mobile" radio sends messages via radio signal between a stationary transmission point and mobile receiving units. It is generally used for cellular telephony, dispatch services (e.g., taxis, delivery vehicles and police cars) and mobile paging services such as those AAPC's members provide. *See Telocator Network of Am. v. F.C.C.* 691 F.2d 525, 527 (D.C. Cir. 1982); 17 F.C.C.R. 6194, 6222 (2002).

[5] The FCC states that for many years its practice has been to permit the use of frequencies that are 12.5 kHz removed from the regularly assigned frequencies for low power use on a "secondary basis." *See* Resp's Br. 3 n.2. Radio communications authorized on a "secondary basis" must not cause interference with those offered on a "primary basis" and are not protected from interference from those primary operations. 47 C.F.R. § 90.7.

[6] *See* 10 F.C.C.R. 10076, 10110 (1995); 47 C.F.R. § 90.267(a).

[7] In September 2000, the Land Mobile Communications Council, an association composed of land mobile radio service users and providers such as railroads, state highway and transportation officials, fire chiefs and fish and wildlife agencies, petitioned for a

*Amendment of Part 90 of the Commission's Rules and Policies for Applications and Licensing of Low Power Operations in the Private Land Mobile Radio 450–470 MHz Band, Report and Order*, 18 F.C.C.R. 3948, 3949 (2003). The new offset channels, referred to as "Group C" channels in the Low Power Order, were intended for small business use, particularly by individuals like plumbers and electricians who move among fixed job locations and need short-term on-site communications capacity on an "itinerant" basis.[8] *Id.* at 3970–71.

After the Low Power Order issued, AAPC petitioned for reconsideration, requesting the FCC to "eliminate the licensing and use" of the offset frequencies that are only 12.5 kHz removed from eight frequencies used by a number of its members to provide mobile paging services in the 462 MHz band. *AAPC Petition for Reconsideration*, WT Docket No. 01-146, May 21, 2003, at 7–8. In its petition, AAPC noted that it was a "newly organized national trade association" formed after the comment period for the Notice of Proposed Rulemaking that led to the Low Power Order had closed. *Id.* at 3. AAPC based its petition for reconsideration on two related grounds: (1) relying on *Chevron v. Natural Resources Defense Council*, 467

---

rulemaking to allow offset channels in the 450–470 band of frequencies to be made available to provide low power users "needed flexibility in establishing short-term communications systems." *Land Mobile Communications Council*, *Petition for Rule Making*, RM-9966 (filed Sept. 11, 2000). The FCC largely adopted the Council's proposal in the Low Power Order.

[8] "Itinerant" operation is defined as operation of a radio station at unspecified locations for varying periods of time. 47 C.F.R. § 90.7.

U.S. 837 (1984), it claimed that the allocation of the offset frequencies was "fundamentally inconsistent with the statutory requirement" that "Part 90 CMRS licensees be subjected to technical requirements that apply to licensees that are providers of substantially similar common carrier services"; and (2) it maintained the offset frequencies would necessarily subject its members to unreasonable interference, degrading the quality of service provided by Part 90 carriers as compared to Part 22 carriers. *Id.* at 3–4.

The FCC rejected both grounds.[9] It first disagreed with AAPC's claim that it was statutorily required to ensure that Part 90 paging operations now subject to CMRS regulatory treatment meet the same technical requirements as common carrier paging operations subject to Part 22 of the rules. Denial Order, 19 F.C.C.R. at 18505 ¶ 11. The Commission noted that OBRA section 6002(d)(3) required it to "modify its rules, to the extent 'necessary and practical,' to ensure that substantially similar services are subject to 'comparable' technical requirements"—not identical requirements—and that the statute confers "substantial discretion on the Commission to determine how this objective should be accomplished." *Id.* (citing *Further Notice of Proposed Rulemaking*, *Implementations of Sections 3(n) and 332 of the Communications Act, Second Report and Order*, 9 F.C.C.R. 2863, 2864–69 ¶¶ 21–24). The Commission concluded that it was not required by OBRA "to modify existing rules if such modification is unnecessary to achieve regulatory

---

[9] The FCC first concluded that, to the extent the petition requested that the licensing and use of offset channels be eliminated, it was untimely filed because the offset channels were not "established" by the Low Power Order; instead, they had been available for years. Denial Order at 4–5.

symmetry or is otherwise impractical." *Id.* In addition, because Part 90 paging services were licensed in a different manner from Part 22 paging services and operated on channels that were shared rather than exclusive, AAPC had no support for its view that eliminating the use of offset channels was necessary and practical to make the technical treatment of the two services comparable. *Id.* Regarding AAPC's interference challenge, the FCC concluded that it rested on a faulty premise; namely, the reduction of buffer protection from 25 kHz to 12.5 kHz caused interference. The offset frequencies had been available for construction and small business use before the Low Power Order and "the lack of interference complaints [due to use of those frequencies] to date [was] significant." *Id.* at 18506 ¶ 13. In addition, the nature of the Part 90 channels also precluded a claim to exclusive use or freedom from interference because Part 90 channels "are available only on a shared basis . . . [and] entities [operating on those channels] are not entitled to specific interference protection and should expect other operations in the same area." *Id.* The FCC stated that it "continue[d] to believe" that the paging and low power operations could compatibly exist in the 450–470 MHz band, *id.* at 18506 ¶ 14, and denied AAPC's petition. AAPC now petitions for review of the denial of its petition for reconsideration.

## II.

Both the Communications Act, 47 U.S.C. §§ 402 *et seq.* (the Act), and the Judicial Review Act, 28 U.S.C. §§ 2341 *et seq.*, provide for our jurisdiction to review Commission decisions. Section 402(a) of the Act governs a proceeding "to enjoin, set aside, annul, or suspend any order of the [Federal Communications] Commission under this Act." 47 U.S.C. § 402(a). Section 2342 of the Judicial Review Act confers on the court of appeals "exclusive jurisdiction to enjoin, set aside,

suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342. The FCC argues that we have no jurisdiction to review the Denial Order because an order that merely denies a petition for agency reconsideration is committed to the agency's discretion, *see* 5 U.S.C. § 701(a)(2), and is therefore unreviewable. *Sendra Corp. v. Magaw*, 111 F.3d 162, 166 (D.C. Cir. 1997) (agency's denial of request for consideration committed by law to agency discretion and therefore generally unreviewable); *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 279 (1987) (*BLE*) (agency's denial of petition for reconsideration not subject to judicial review if petition alleges only material error in agency's original decision).[10]

AAPC posits two theories under either of which, it maintains, its petition is excepted from the nonreviewability rule: (1) the FCC "reopened" the proceeding when it addressed the merits of AAPC's OBRA claim in the Denial Order, *see, e.g., Sendra,* 111 F.3d at 167; or (2) AAPC's OBRA claim pressed in its reconsideration petition constitutes "new information" that makes the denial of the petition reviewable. *See, e.g., Fritsch v. ICC*, 59 F.3d 248, 251–52 (D.C. Cir. 1995)

---

[10] AAPC seeks review of the Denial Order only; it makes no mention of the Low Power Order nor can inclusion of that order be fairly inferred. Pet'r's Reply Br. 7 n.13. *Cf. Schoenbohm v. FCC*, 204 F.3d 243, 245-46 (D.C. Cir. 2000) (holding petitioner's intent to seek review of order not designated in its petition for review can be "fairly inferred" from petition or documents filed contemporaneously with that order); *Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 155 (D.C. Cir. 2002) (same); *Damsky v. FCC*, 199 F.3d 527, 533 (D.C. Cir. 2000) (same).

(information provided by petitioner not able to participate in earlier proceeding considered "new evidence" permitting review).

It is true that if an agency issues a new order after reconsideration, the new order constitutes final agency action that is subject to judicial review, even if the new order merely reaffirms the previous decision. *BLE*, 482 U.S. at 278 ("When the Commission reopens a proceeding for any reason and, after reconsideration, issues a new and final order setting forth the rights and obligations of the parties, that order—even if it merely reaffirms the rights and obligations set forth in the original order—is reviewable on its merits."). Reopening, however, does not necessarily occur by dint of the agency's consideration of the merits. In *Sendra* we held that an agency order that denies reconsideration and does not alter the original decision is "conclusive" and, unless "the agency has clearly stated or otherwise demonstrated that it has reopened the proceeding," its denial of reconsideration is only that; "[c]ourts will not, in other words, look behind the agency's formal disposition of the reconsideration request to see whether the agency 'in fact' reopened its original decision (and thus rendered a new final order)." *Sendra*, 111 F.3d at 167 (citing *BLE*, 482 U.S. at 280–81) (internal quotations omitted); *see also BLE*, 482 U.S. at 273 (irrelevant to reviewability that agency order denying reconsideration discussed merits at length).[11]

---

[11] AAPC's reliance on *Graceba Total Communications v. FCC*, 115 F.3d 1038 (D.C. Cir. 1997), is misplaced. Graceba's argument that the denial of reconsideration was reviewable was a constitutional one made in the wake of an intervening Supreme Court decision rather than an argument based on the same record. *Graceba*, 115 F.3d at 1041–42.

AAPC's second theory is that its non-participation in the proceeding that produced the Low Power Order means that its petition for reconsideration constitutes "new information" that permits us to review the Denial Order. As AAPC correctly argues, we have found in the past that factual developments that occur post-rulemaking can be "new evidence," creating a second exception to the nonreviewability rule. *Jost v. Surface Transp. Bd.*, 194 F.3d 79, 94 (D.C. Cir. 1989); Petr's Reply Br. 9. But the basis for finding that the information in *Jost* constituted new evidence—the fact that the information did not exist before the agency took action—is absent here. *See Jost*, 194 F.3d at 86 ("we believe that it is clear that the purpose of Jost's petition was not to challenge the Board's reasoning but to bring new material to its attention, and therefore the decision not to reopen the proceeding is reviewable") (citing *Fritsch*). Here, the "new evidence" AAPC proffers is the Low Power Order's alleged noncompliance with the congressional mandate contained in OBRA—"evidence" that existed and could have been submitted before the FCC promulgated its final rule. Nor does the *possibility* of interference due to the availability of the offset channels for low power use constitute new evidence under *Jost*. *If* the Low Power Order results in actual interference, as AAPC predicted at oral argument, that interference may constitute new evidence and review of the denial of a renewed petition for reconsideration on that basis might well be granted.

AAPC also relies on the holding in *Transportation Intelligence, Inc. v. FCC*, 336 F.3d 1058 (D.C. Cir. 2003) (*TransIntel*), where we stated that "the principle that agency denials of reconsideration are generally nonreviewable is inapplicable where the Commission decision being reviewed were dispositions of the petitioner's first filings at each level of the agency." Pet'r's Reply Br. 8 (citing *TransIntel*, 336 F.3d at 1062). But not every first filing before an agency is a first filing

for *TransIntel* purposes. TransIntel contested the FCC's Office for Engineering Technology's grant of an equipment certification application to another party. *TransIntel*, 336 F.3d at 1061. TransIntel then petitioned the Commission to review the decision and the FCC denied the petition. We found the FCC's denial reviewable because, under the Commission's rules, the petition for reconsideration of the Engineering Technology decision was the first opportunity TransIntel had to make any kind of filing regarding the application; the "rules concerning equipment certification applications provide no mechanism for an opponent to contest an application before it is granted." *Id.* at 1062 (citing 47 C.F.R. § 2.923, which provides that "[p]ersons aggrieved by virtue of an equipment authorization action may file with the Commission a petition for reconsideration or an application for review"). TransIntel's "petition for reconsideration" in that case was not simply its first appearance before the Commission; it was its "only option and revocation [of the certification] its only remedy." *Id.* at 1063. Properly read, *TransIntel* held that if a party's appearance before the agency is its first, *and only possible,* opportunity to seek review of agency action, the nonreviewability rule does not apply.

While AAPC did not participate in the rulemaking until the petition for reconsideration stage, AAPC's members had the opportunity to participate before the Denial Order. AAPC contends that it was not in existence when the rulemaking occurred and therefore could not formally participate through notice and comment. But AAPC's members could have individually participated in the rulemaking before AAPC's creation. In addition, even now, the rulemaking process is open to AAPC or any of its members, both of whom are free to petition the FCC for a new rulemaking to challenge—by amendment or repeal—the Low Power Order and, specifically,

its authorization of low power operations on the 462 MHz band. *See* 47 C.F.R. § 1.401 ("[A]ny interested person may petition for the issuance, amendment, or repeal of a rule or regulation."). If in fact the use of the low-power frequencies exposes AAPC's members to increased interference, the denial of a petition for rulemaking based thereon could be subject to review notwithstanding the generous measure of discretion usually afforded an agency in its rulemaking process. *See Geller v. FCC*, 610 F.2d 973, 979 (D.C. Cir. 1979) (court reviewed agency's denial of petition for new rulemaking to revisit original rule where subsequent events affected continuing validity of rule).

For the foregoing reasons, AAPC's petition for review of the FCC's denial of reconsideration is dismissed.

*So ordered.*