UNITED STATES CELLULAR
CORPORATION,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

Association of Public–Safety Commu-
nications Officials–International,
Inc., et al., Intervenors.

Nos. 00–1072, 00–1536, 00–
1538, and 01–1047.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 15, 2001.

Decided June 29, 2001

Thomas P. Van Wazer argued the cause for petitioners. With him on the briefs were James P. Young, Donald J. Evans and Sylvia Lesse. Stephen G. Kraskin entered an appearance.

Roberta L. Cook, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were Christopher J. Wright, General Counsel, John E. Ingle, Deputy Associate General Counsel, Catherine G. O'Sullivan and Andrea Limmer, Attorneys, U.S. Department of Justice. Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, entered an appearance.

Robert M. Gurss and Tamara Y. Brown were on the brief for intervenor Association of Public–Safety Communications Officials–International, Inc.

Before: HENDERSON, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In an effort to speed implementation of enhanced 911 services for wireless phones, the Federal Communications Commission removed a provision conditioning wireless carriers' obligation to purchase and install the necessary technology on guaranteed state or local government funding. The carriers challenge this decision, arguing that, among other things, it contravenes the cost causation principle adopted by this court in *Competitive Telecommunications Association v. FCC*, 87 F.3d 522, 529 (D.C.Cir.1996) (*"Comptel"*), is arbitrary and capricious, 5 U.S.C. § 706(2)(A), violates the Regulatory Flexibility Act, 5 U.S.C. §§ 601–612, and amounts to an unconstitutional taking. Finding petitioners' arguments either without merit or not properly before us, we deny the petition for review in its entirety.

I

Over the last thirty years, 911 service has "spread across the nation and become synonymous with emergency assistance." *In re Revision of the Comm'n's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Sys.*, 11 FCC Rcd 18676 ¶ 3 (1996) (*"First Report & Order"*). At its most basic, 911 service involves routing calls to state or local governmental entities responsible for coordinating emergency response, known as Public Safety Answering Points ("PSAPs"), which dispatch emergency assistance to callers. Most PSAPs now provide E911—enhanced 911—services for calls placed from traditional landline phones, using Automatic Numbering Identification ("ANI") to determine a caller's phone number and Automatic Location Identification ("ALI") to pinpoint a caller's location. For landline calls, ALI information is typically determined by looking up the caller's phone number in an address/telephone number database.

Although wireless callers place a large number of 911 calls, implementing E911 services for wireless phones has proven more difficult. In June 1994, a group of public safety organizations (including the Association of Public–Safety Communications Officials ("APCO"), intervenor here) issued an Emergency Access Position Paper highlighting the need to make E911 services available to wireless callers to "facilitate rapid and effective contact with emergency services, when and where needed." Shortly thereafter, the Commission issued a notice of rulemaking to "ensure that, over time, [wireless callers would] have the same level of access to 911 emergency services as [landline] callers," and proposed requiring wireless carriers to make both ANI and ALI information available to PSAPs. *In re Revision of the Comm'n's Rules to Ensure Compatibility*

*With Enhanced 911 Emergency Calling Sys.,* 9 FCC Rcd 6170 ¶¶ 37, 50–52 (1994).

After the comment period ended, APCO and two other public safety bodies, together with the Cellular Telecommunications Industry Association ("CTIA"), a trade association of wireless industry participants, filed with the Commission a Consensus Agreement addressing wireless E911 implementation. Among other things, the Agreement proposed a cost recovery mechanism to fund carrier and PSAP investment in E911 technology, asking the Commission to condition the obligation to make these investments on a guarantee of state or local government funding. The Commission also sought public comment on this Consensus Agreement.

After receiving comments on its proposal and the Consensus Agreement, the Commission adopted its *First Report & Order,* which established a two-phase plan for wireless E911 implementation. Phase I, to have been completed in eighteen months, required wireless carriers to enable PSAPs to determine a caller's ANI and the location of the base station or cell site receiving the 911 call. *First Report & Order,* 11 FCC Rcd 18676 at ¶ 10. Wireless carriers had five years to complete Phase II, which required them to enable PSAPs to identify a caller's ALI within a specified range. *Id.* Wireless carriers can implement Phase II in at least two ways. One is network-based, determining a caller's location by triangulating signals from several different cell sites or base stations. *In re Revision of the Comm'n's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Sys.,* 14 FCC Rcd 17388 ¶ 23 (1999) ("*Third Report & Order*"). The other is handset-based; it incorporates locating functionality (such as Global Positioning System technology) into the telephone itself. *Id.* at ¶ 18.

Under the Commission's Order, carriers' Phase I and Phase II obligations would not be triggered until two conditions were met: (1) the carrier had to receive a request for these services from a PSAP capable of receiving and utilizing the data; and, responding to the Consensus Agreement's cost recovery provision, (2) "a mechanism for the recovery of costs relating to the provision of such services" had to be in place. *First Report & Order,* 11 FCC Rcd 18676 at ¶ 11. The Commission prescribed no particular cost recovery mechanism, however, because "[n]o party dispute[d] the fundamental notion that carriers must be able to recover their costs of providing E911 services" and because "an inflexible Federal prescription would deny carriers and government officials the freedom to develop innovative cost recovery solutions." *Id.* at ¶¶ 89–90.

The Commission also responded to comments by rural wireless carriers that "providing ALI in rural areas may not be technologically and economically feasible," *id.* at ¶ 84, and that carrier cost recovery mechanisms might not fully reimburse these higher implementation costs. According to the rural carriers, a network-based method of providing ALI would be difficult because, given the configuration of many rural providers' towers as a "string of pearls" along a highway, triangulation would require a large number of additional towers and equipment. Petitioners' Opening Br. at 17; *cf. Third Report & Order,* 14 FCC Rcd 17388 at ¶ 23. They also claimed they had no alternative, because the handset-based solution was not yet technologically available. The Commission concluded that these problems "need not delay adoption of the general rule" because "[i]n cases where the cost recovery mechanism for E911 service uniquely disadvantages a particular carrier, we will . . . consider waiver requests." *First Report & Order,* 11 FCC Rcd 18676 at ¶ 84.

Reconsidering the *First Report & Order*, the Commission reaffirmed its decision not to prescribe a particular cost recovery mechanism. *In re Revision of the Comm'n's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Sys.*, 12 FCC Rcd 22665 ¶¶ 143–146 (1997). CTIA filed for a second reconsideration, asking the Commission to clarify that state and local governments could not satisfy the carrier cost recovery requirement by asking carriers to recover their own costs directly through charges to wireless customers, and to mandate that the cost recovery mechanisms states and localities adopt be "competitively neutral." In response, and after receiving a Joint Status Report filed by the Consensus Agreement parties (joined by the Wireless Consumers Alliance, Inc.) revealing that Phase I implementation was proceeding more slowly than planned, the Commission issued a Public Notice seeking information on whether the carrier cost recovery requirement was responsible for the delay, and if so, how to address this problem. Public Notice, *Comm'n Seeks to Facilitate Wireless E911 Implementation and Requests a Report*, 14 FCC Rcd 11138, 11138 (1999). Petitioners United States Cellular Association ("US Cellular") and the Rural Cellular Association ("RCA") submitted comments.

In the resulting *Second Reconsideration Order*, the Commission found that the "prerequisite that there be a carrier cost recovery mechanism has not expedited the delivery of E911 service and, if anything, has become and will continue to be an impediment of E911 service." *In re Revision of the Comm'n's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Sys.*, 14 FCC Rcd 20850 ¶ 42 (1999) ("*Second Recons. Order*"). Although twenty-seven states had enacted some sort of Phase I cost recovery legislation, *id.* at ¶ 34, these services were "scarce, and, in most parts of the country,

nonexistent," *id.* at ¶ 33. Twenty-three states had no Phase I cost recovery mechanism in place, and even in the states that had enacted legislation, the Commission found that disputes about the adequacy and administration of cost recovery interfered with Phase I implementation. *Id.* at ¶ 36. The Commission further agreed with APCO that, because few state and local governments had enacted Phase II legislation, and because the costs of doing so would likely exceed Phase I costs, carrier cost recovery threatened to become an even greater obstacle to Phase II implementation. *Id.* at ¶ 42.

To alleviate these delays, the Commission dropped the carrier cost recovery requirement, noting that "[wireless] carriers are not subject to rate regulation, and may adjust their rates to reflect the cost of providing E911 services without [Commission] intervention." *Id.* at ¶ 49. According to the Commission, passing costs on to consumers is "the normal way that costs of doing business, including the costs of complying with government-imposed requirements, are recovered in an industry free of rate regulation." *Id.* at ¶ 61.

Addressing comments that eliminating the carrier cost recovery requirement would unfairly discriminate against rural carriers, the Commission concluded that the record contained insufficient evidence to support the claim that rural carriers' implementation costs are higher, and that, even if they are, "it is not clear that such costs should be pooled for recovery in this competitive, deregulated industry." *Id.* at ¶ 57.

Petitioners RCA and Corr Wireless Communications ("Corr") sought further reconsideration of the *Second Reconsideration Order*, contending that the Commission had improperly disregarded rural carriers' concerns about cost recovery. Corr,

a rural carrier, submitted detailed information on its Phase II implementation costs. The reconsideration petitions also argued that the Commission's action violates universal service requirements under 47 U.S.C. § 254 and amounts to an unconstitutional taking in violation of the Fifth Amendment. Although petitioners had not made these claims in the proceedings leading to the *Second Reconsideration Order* (in fact, Corr had not even participated in those proceedings), Corr argued that its failure was excusable because the Commission had not given adequate notice of the possibility that it would abandon the carrier cost recovery requirement. Disagreeing, and finding that commenters had presented no "new or persuasive evidence" to justify reopening the proceedings, the Commission denied reconsideration. *In re Revision of the Comm'n's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Sys.*, 15 FCC Rcd 22810 ¶ 8 (2000) ("*Fifth Memorandum & Order*").

RCA and Corr have now filed a petition for review of the Commission's decision to deny reconsideration of the *Second Reconsideration Order*. All three petitioners also challenge the *Second Reconsideration Order* itself, arguing that the Commission's decision to eliminate the carrier cost recovery requirement violates this circuit's cost causation principle. *See Comptel*, 87 F.3d at 529. They also argue that the Commission acted arbitrarily and capriciously in violation of the Administrative Procedure Act and violated both the Regulatory Flexibility Act and the takings clause of the Fifth Amendment.

## II

We begin with petitioners' contention that eliminating the carrier cost recovery requirement runs afoul of this circuit's cost causation principle. In *Comptel*, we held that when the Commission sets rates, it "must ... specifically justify any rate differential that does not reflect cost." 87 F.3d at 529. In that case, the Commission had established a rate structure that essentially required large long distance carriers to subsidize smaller ones. Concluding that "the attempt to recover costs from [long distance carriers] that did not cause those costs to be incurred would impart the wrong incentives," *id.* at 530–31, we vacated the Commission's order. *Comptel* based its cost causation principle on both APA section 706(A)(2), which makes unlawful arbitrary and capricious agency actions, 5 U.S.C. § 706(2)(A), and then-existing versions of Communications Act sections 201 and 202, which presently provide that "charges ... for and in connection with [a] communication service, shall be just and reasonable," 47 U.S.C. § 201(b), and that "[i]t shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges ... for or in connection with [a] communication service," *id.* § 202(a). *See Comptel*, 87 F.3d at 529. Petitioners here argue that neither they nor their customers caused the E911 costs, and therefore that *Comptel* prohibits the Commission from requiring them to pay for the cost of implementation.

The Commission argues that petitioners may not rely on the cost causation principle because they failed to raise Communications Act sections 201 and 202 in the proceedings before the agency. *See* 47 U.S.C. § 405(a)(2); *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279 (D.C.Cir.1997) (interpreting section 405(a)(2) as requiring that the Commission "be afforded an 'opportunity to pass' on an issue as a condition of judicial review."). Alternatively, the Commission argues, even if the cost causation principle were properly raised, it applies only when the Commission is setting rates. Petitioners concede their fail-

ure to cite Communications Act sections 201 and 202 in the proceedings before the Commission, but claim that they have not waived reliance on these sections because the "issue [was] necessarily implicated by the argument made to the Commission." *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 80 (D.C.Cir.1998). Additionally, they argue that because the cost causation principle also rests on the APA's prohibition against arbitrary and capricious agency action, it applies whether or not the Commission is setting rates. We need not resolve these disputes, however, because even if the cost causation principle applies outside rate-regulated industries and is properly before us, petitioners' argument fails.

■ Petitioners claim that the "cost causer" for wireless E911 is "clearly" the PSAP: "E911 capabilities are not necessary to provide wireless service. Rather, carriers are forced to install these E911 capabilities at the instigation of and for the use of the PSAPs in their provision of emergency services." Petitioners' Opening Br. at 28. Compelling carriers rather than PSAPs to bear financial responsibility for wireless E911 implementation by passing some or all of the costs on to their customers, petitioners claim, violates the cost causation principle. We disagree.

For one thing, PSAPs are not the cost causers for wireless E911 implementation. As the Commission points out:

> Wireless E911 services are provided for the benefit of all subscribers, to enable them to call and receive prompt attention from public safety agencies. . . . It is entirely rational for subscribers to wireless services to pay through their charges for the costs the Commission has required the carriers to incur to upgrade their systems to include E911 services. Subscribers, after all, are the ultimate beneficiaries when E911 calls

go through and public safety agencies respond.

Respondent's Br. at 34–35.

Petitioners' argument to the contrary rests on a profound misunderstanding of PSAPs and their public safety function. Petitioners seem to think that PSAPs are private businesses—like commercial ambulance makers, to use petitioners' own example—providing for-profit services to the public. If this were true, petitioners might have a point. But PSAPs are governmental entities playing a critical role in the provision of public safety services: in larger urban areas, they are stand-alone government-funded organizations; in smaller rural areas, they may be local law enforcement offices. PSAPs themselves derive no benefit from wireless E911 services; rather, they provide safety services to benefit the public. Under the Commission's Order, it is the beneficiaries of these services who ultimately pay most if not all of the cost of wireless E911 implementation.

Petitioners argue that wireless customers have not directly requested carriers to provide them with E911 services. This is certainly true, but the Commission, as their governmental representative, has made this request on their behalf. Thus, in a sense, the Commission itself is the cost causer—it is the Commission's Order that requires wireless carriers to provide E911 services in the public interest. Whether the Commission or the wireless customer is the cost causer, we need not decide. What's important is that on no plausible theory are PSAPs the cost causers: their only role is providing 911 service. True, a PSAP request is a precondition of a wireless carrier's obligation to implement E911 technology, *First Report & Order*, 11 FCC Rcd 18676 at ¶ 11, but the obligation itself results from the Com-

mission's Order, and the beneficiary of that obligation is the public.

The public nature of wireless E911 services distinguishes this case from *Comptel.* There, the Commission had required some private businesses (large long-distance carriers) to subsidize others (smaller long-distance carriers). This produced competitive distortion in the private market, insulating some inefficient smaller firms from the pressures of the marketplace. *Comptel,* 87 F.3d at 530. In this case, by contrast, eliminating the carrier cost recovery requirement produces no such inefficiencies; it merely imposes the cost of E911 service on its beneficiaries.

Disagreeing, petitioners claim that eliminating the carrier cost recovery requirement will lead to "inefficient economic behavior, because [the government is] not required to internalize the costs of building [E911 capabilities]." Petitioners' Opening Br. at 29. Petitioners apparently think that, if governmental entities are not obliged to cover the costs of the public benefits they impart, they may order safety services that wireless customers do not really want, or at least do not want at the price they must pay. This potential "inefficiency," petitioners claim, violates the cost causation principle.

This argument is breathtaking. If petitioners were correct, the Federal Aviation Administration could not require airlines to install safety equipment without reimbursing them for their costs, the Environmental Protection Agency would have to pay factories for the cost of required pollution-reducing technology, and the Department of Transportation would have to pay automobile manufacturers to install safety belts and air bags. Each of these agencies has "caused" the cost of its regulatory safety requirements in the same way the Commission has caused the cost of wireless E911 implementation. Yet it is ludi-crous to suggest that government cannot pass these costs along to regulated entities.

Attempting to distinguish these sorts of safety regulations from the Commission's action in this case, petitioners' counsel observed at oral argument that the Commission has chosen to implement its wireless E911 mandate not directly, but through PSAPs. But the manner in which the Commission chooses to implement its regulations is irrelevant. The fact remains that the Commission has imposed upon wireless carriers an obligation to implement a service in the public interest. Whether it does this directly or with the cooperation of other governmental safety organizations, it has no obligation to compensate carriers for their costs.

If, as petitioners fear, the government improperly assesses the public interest—for instance, if consumers would rather pay less for wireless phones without E911 or cars without safety belts—the remedy is political, not judicial. Granting petitioners the relief they seek, moreover, would not necessarily have any impact at all on this so-called inefficiency. If the carrier cost recovery requirement were still in place, a state or local government could decide to place a tariff on wireless service exactly equal to the amount carriers would have to raise rates to cover the costs of implementation. At oral argument, petitioners' counsel conceded that such a tariff would not violate the cost causation principle (if the Commission could in some way be held responsible for it), because government would bear the costs of wireless E911 implementation. Yet any "inefficiency" caused by requiring carriers to pass implementation costs along to their customers would result equally from such a state or local tariff.

■ Petitioners claim that eliminating the carrier cost recovery requirement produces another competitive distortion: "because rural carriers' costs of implementing E911 capabilities are higher per customer than those of predominantly urban carriers, the [Commission's] rule introduces artificial, [Commission]-created competitive inequalities between rural and urban carriers." Petitioners' Opening Br. at 30. We are skeptical, however, that this claim has anything at all to do with *Comptel*'s cost causation principle. Petitioners do not argue (nor could they) that the Commission has required rural carriers to subsidize costs caused by urban ones. Instead, petitioners seem to be arguing that, like the rate structure invalidated in *Comptel,* the Commission's elimination of the carrier cost recovery requirement is arbitrary and capricious because it distorts the competitive marketplace. But the Commission found insufficient evidence to conclude that rural carriers' implementation costs are higher. *Second Recons. Order,* 14 FCC Rcd 20850 at ¶ 57. Even assuming that they are, however, it is because (as petitioners recognize) rural carriers do business in areas with lower population density. And again, because a cost recovery requirement could result in tariffs equal in amount to carriers' increased rates, granting petitioners the relief they seek would not necessarily alleviate any inequality.

Petitioners presumably hope that a government cost recovery mechanism would pool wireless E911 costs, distributing them equally among rural and urban carriers. But such pooling, the Commission found, may itself distort the competitive marketplace: to preserve competition, carriers ought to be responsible for the potentially greater costs of doing business in rural areas. *Id.* Petitioners' solution may thus create exactly the distortion they seek to avoid.

## III

■ This brings us to petitioners' other APA challenges. They first argue that the Commission failed to consider alternative causes of the delay in wireless E911 implementation. In particular, petitioners point to three alternatives suggested by commenters: lack of liability protection for wireless carriers and PSAPs; Local Exchange Carriers' failure to fulfil their obligations; and disputes between carriers and PSAPs over which technology to use in implementing wireless E911. The Commission responds that it found the carrier cost recovery requirement to be a significant cause of delay, *Second Recons. Order,* 14 FCC Rcd 20850 at ¶ 38, and that even if other causes exist, it need not address all wireless E911 implementation problems at the same time. We agree. As we said in *National Association of Broadcasters v. FCC,* agencies need not address all problems "in one fell swoop." 740 F.2d 1190, 1207 (D.C.Cir.1984) (citing *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) ("[R]eform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind.")). In any event, and contrary to petitioners' claim, the Commission *did* address these alternative explanations, finding that problems caused by lack of liability protection were mooted by legislation granting such protection, *Second Recons. Order,* 14 FCC Rcd 20850 at ¶ 9; that the Telecommunications Act of 1998 and existing regulations already require Local Exchange Carriers to fulfill their obligations, *id.* at ¶ 8; and that the Commission is available to mediate technology disputes between PSAPs and carriers, *id.* at ¶ 7.

■ Petitioners next argue that the Commission failed to consider alternative solutions to the problems posed by the

carrier cost recovery requirement, including drafting more specific instructions and guidelines on the most disputed cost recovery issues and permitting carriers to file federal tariffs to recover their costs. As the Commission points out in its brief, however, it gave reasons for rejecting both alternatives. Respondent's Br. at 25–27 (citing *Second Recons. Order,* 14 FCC Rcd 20850 at ¶¶ 49–52). In reply, petitioners, apparently missing this section of the Commission's brief, not only reassert that the Commission "simply ignored these proposals," Petitioners' Reply Br. at 14, but also make no effort to argue what they must: that the Commission's reasons for rejecting these alternatives were inadequate or unsupported by record evidence. *See Comm. for Cmty. Access v. FCC,* 737 F.2d 74, 83 (D.C.Cir.1984).

■ Petitioners argue that the Commission's decision to eliminate the carrier cost recovery requirement finds no support in the record because "*none* of the parties ... (with the exception of APCO ... ) recommended the elimination of carrier cost recovery." Petitioners' Opening Br. at 37. But the Commission has no obligation to take the approach advocated by the largest number of commenters, *Natural Res. Def. Council v. EPA,* 822 F.2d 104, 122 n. 17 (D.C.Cir.1987); indeed, the Commission may adopt a course endorsed by no commenter. The Commission's only responsibilities are to respond to comments, 5 U.S.C. § 553, and to choose a reasonable approach backed up by record evidence, *Comm. for Cmty. Access,* 737 F.2d at 83.

■ Next, petitioners argue that, in eliminating the cost recovery requirement, the Commission "dramatically" departed from precedent without explanation. Petitioners' Opening Br. at 38. In particular, they argue, the Commission gave no reason for abandoning its goal of achieving parity in wireless and landline services, so these services can "truly be viewed as substitute[s] by American consumers." *In re Revision of the Comm'n's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Sys.,* 14 FCC Rcd 10954 ¶ 4 (*"Second Report & Order"*). Because landline carriers typically recover E911 costs by obtaining state authorization to add a surcharge to customers' bills, petitioners claim that to achieve parity between landline and wireless phone service, wireless E911 should be funded through a similar state tariff. But the Commission's apparent focus in achieving wireless and landline parity is not on making funding methods identical, but on equalizing services available to consumers: one of the Commission's parity goals is to ensure that consumers have access to E911 services whether they use landline or wireless phones. *Second Report & Order,* 14 FCC 10954 at ¶ 4 ("We expect to continue to explore ways to improve wireless 911 service because the improvement of wireless 911 is an essential element in applying wireless communications to improving public safety and hastening the day when wireless and [landline] can truly be viewed as substitute services by American consumers."). Because the Commission found that carrier cost recovery was impeding wireless E911, its action furthers, not frustrates, the goal of wireless/landline parity. And as the Commission points out, the difference in funding mechanisms reflects an important difference in the way each service is regulated: landline carriers are rate-regulated; wireless carriers are not. Because landline carriers are unable to pass E911 implementation costs along to customers, as wireless carriers can, the Commission had more than sufficient reason to choose a different E911 implementation scheme for wireless carriers.

■ Finally, petitioners argue that the Commission's analysis of the impact of its Order on rural carriers was arbitrary and capricious. In response to comments that eliminating the carrier cost recovery requirement would unduly burden rural carriers, the Commission found insufficient record evidence to support commenters' claims that the costs of wireless E911 implementation in rural areas would, in fact, be higher. *Second Recons. Order,* 14 FCC Rcd 20850 at ¶ 57. "While some costs will likely be higher in such areas," the Commission stated, "other costs may actually be lower, such as construction costs or other infrastructure needs." *Id.* In its brief in this court, the Commission notes that neither RCA nor U.S. Cellular submitted any specific financial data to support their claims of higher costs. Without specific evidence, the Commission was entitled to conclude that petitioners failed to demonstrate that rural carriers would disproportionately suffer from eliminating the carrier cost recovery requirement.

■ According to petitioners, Corr, a rural carrier, did supply specific financial data. But Corr submitted this evidence for the first time in its petition for reconsideration of the *Second Reconsideration Order.* Refusing to reopen the proceeding, *Fifth Memorandum & Order,* 155 FCC Rcd 22810 at ¶ 30, the Commission found that Corr had adequate notice of the possibility that the Commission would drop the carrier cost recovery requirement, and that Corr had not submitted "new or persuasive evidence that [the Commission's] conclusions were in error," *id.* at ¶ 8. "Where ... the Commission refuses to reopen a proceeding, what is reviewable is merely the lawfulness of the refusal," *ICC v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 278, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1986) (emphasis omitted)—in this case, the Commission's determination that adequate notice had been given and its finding that Corr's data did not qualify as new evidence requiring reconsideration, *see Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 295, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (listing cases discussing agency error in failing to reopen proceedings to consider new evidence). Because petitioners offer no challenge to this part of the Commission's decision, we lack jurisdiction to consider the implications of Corr's cost data on the *Second Reconsideration Order,* as well as other challenges to that order contained in the rejected reconsideration petitions. *Bhd. of Locomotive Eng'rs,* 482 U.S. at 282, 107 S.Ct. 2360.

## IV

■ The Regulatory Flexibility Act obliges federal agencies to assess the impact of their regulations on small businesses. *See* 5 U.S.C. §§ 601–612. Petitioners claim that the Commission failed to fulfill the RFA's requirement to file a final regulatory flexibility analysis ("FRFA") containing

> a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a)(5). Purely procedural, however, RFA section 604 requires nothing more than that the agency file a FRFA demonstrating a "reasonable, good-faith effort to carry out [RFA's] mandate." *Alenco Communications, Inc. v. FCC,* 201 F.3d 608, 625 (5th Cir.2000). Petitioners dispute neither that the Commission included a FRFA in its *Second Reconsideration Order,* 14 FCC Rcd 20850, 20901 app. C, nor that this statement addresses all

subjects required by the RFA. Instead, petitioners argue that the Commission's analysis of the impact its action would have on small carriers and its dismissal of alternatives was arbitrary. But as we have already seen, the Commission's analysis of the impact on small rural carriers, *supra* at 88, and its reasons for dismissing alternatives to eliminating the carrier cost recovery requirement, *supra* at 86–87 were entirely reasonable.

▮▮▮▮ Petitioners also argue that the Commission failed to issue an initial regulatory flexibility analysis as required by RFA section 603. 5 U.S.C. § 603. Not only did petitioners fail to raise this argument until their reply brief, *see Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond."), but the RFA expressly prohibits courts from considering claims of non-compliance with section 603, *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C.Cir.2000).

V

Because petitioners' remaining claims—that the Commission's action violates the universal service requirements of the Communications Act, 47 U.S.C. § 254, and the takings clause of the Fifth Amendment, U.S. Const. amend. V—were raised only in petitions for reconsideration of the *Second Reconsideration Order*, thus suffering the same defects as Corr's submission of cost data, *see supra* at 88, we lack jurisdiction to consider them. We therefore deny the petition for review in its entirety.

*So ordered.*